The State of Ohio, Appellee, *v.* Craig, Appellant.

[Cite as *State v. Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571.]

(No. 2004–1554—Submitted April 25, 2006—Decided September 20, 2006.)

Pfeifer, J.

{¶ 1} In this appeal, appellant, Donald Craig, raises 13 propositions of law. For the reasons that follow, we reject all of them except proposition of law X. We have also independently weighed each aggravating circumstance against the mitigating factors and compared the sentence of death to those imposed in similar cases. We affirm the convictions and the sentence of death on the aggravated murder charge.

{¶ 2} On February 28, 1996, at around 6:00 p.m., 12–year–old Roseanna Davenport was walking to her home in Akron, Ohio. Along the way, appellant Donald Craig abducted her, then raped and murdered her. Davenport's body was discovered in the basement of a vacant duplex in Akron on March 5, 1996.

{¶ 3} Police did not solve this murder for six years. In April 2002, DNA testing identified Craig as Davenport's murderer. Subsequently, Craig was tried and convicted of aggravated murder and sentenced to death.

{¶ 4} Davenport and 15–year–old Esther Trijah Stone were friends who lived about a mile apart. Davenport often visited Stone at her home on 111 South Maple Street and once spent the night there. Craig was the boyfriend of Stone's mother, Michelle Lindsay, and lived at the Lindsay home. Craig knew Davenport from these visits. After school on February 28, 1996, Davenport went to Lindsay's home to play with Stone. Davenport told Patricia Huffman, the live-in girlfriend of her father Jerry Davenport, that she would be home by 6:00 p.m. At the Lindsay home, Davenport and Stone talked and watched television. Around 6:00 p.m., Lindsay called a taxi to take Davenport home because it was getting dark outside. Davenport, however, left before the taxi arrived. Craig was in the living room of the Lindsay home when Davenport departed; he left five to ten minutes later.

{¶ 5} When Davenport failed to return home by 7:30 p.m., Huffman drove to Lindsay's home to check on her. Lindsay told Huffman that Davenport had left their house at 6:00 p.m. Huffman then drove around the neighborhood searching for Davenport. The police were notified that Davenport was missing at about 10:00 p.m. Over the next few days, Jerry Davenport and Huffman searched the neighborhood and distributed flyers seeking information about Davenport.

{¶ 6} Michael Johnson bought, fixed, and rented houses. On February 28 or 29, 1996, he viewed the outside of two duplexes on South Maple Street for possible purchase. Each duplex contained two apartments; the apartments at 156 South Maple were vacant. On March 1, Johnson returned to 156 South Maple and entered the building after finding the front door unlocked. He saw trash everywhere, including clothes and upside-down chairs. He also looked in the basement but could not walk around or even "see the floor [because] there was so much stuff down there." Johnson locked the doors to the apartments before departing.

{¶ 7} On March 2, after making an offer to purchase the apartments, Johnson returned to "take a peek" at the property. He noticed that the apartment doors were still locked, and he saw no signs of breaking or entering. Upon learning that his offer to purchase had been accepted, Johnson started cleaning the apartments. On March 5, he entered the basement of the apartment at 156 South Maple and discovered a fully clothed body under a pile of clothing. Johnson called 911.

{¶ 8} Police officers observed that the murder victim had a large abrasion across her neck and multiple injuries on much of her body. Her bra was also rolled up above her breast line. Police investigators collected fibers and carpet samples from the crime scene; they found no usable fingerprints. On the evening of March 5, the murder victim was identified as Roseanna Davenport.

{¶ 9} On March 6, Dr. Roberto Ruiz, the Chief Deputy Coroner for Summit County, conducted an autopsy. He concluded that Davenport had suffered multiple injuries involving the head and neck, the chest, the abdomen, genitalia, and extremities and that Davenport had died as the result of cardiorespiratory arrest due to strangulation. Dr. Ruiz found extensive vaginal injuries. The left labia major was bruised, the vulva was lacerated, and the minor labia had a small area of hemorrhage. Testing of a vaginal swab taken from Roseanna was positive for the presence of semen. Multiple lacerations were also found around the outer edge of the anal opening. The lining of the anus was hemorrhagic, and the anus was dilated. A mouth swab taken from Davenport indicated the likelihood that semen was present.

{¶ 10} The vaginal and anal injuries were consistent with penetration. Inflammation in the vaginal and rectal mucosa established that the vaginal and anal

penetration had occurred before Davenport had been strangled. Based on the autopsy findings, the county's chief medical examiner, Dr. Lisa J. Kohler, estimated that death had occurred from three days to a week before Davenport's body had been found.

{¶ 11} As the investigation progressed, Craig and several other individuals were identified as suspects. On March 11, Detective William Smith talked to Craig and asked him if he had ever seen Davenport. Craig said that "[h]e had not seen her, did not know her." On March 14, the police collected blood, hair, and saliva samples from Craig. The police also collected blood, hair, and saliva samples from other suspects including Duane Craig, the defendant's brother, Eran Riggins, Maurice Cummings, Aaron Trent, the victim's uncle, Frederick Frazier, and James Davenport, another uncle of the victim. Investigators also searched Craig's residence and collected hair and fiber samples.

{¶ 12} In 1996, Mandy Allen and Davenport had been friends and roller-skated together. A few days before Davenport disappeared, a man had chased them while they were roller-skating. According to Allen, the police had been notified and the man had been arrested. Allen also testified that she had seen Davenport in the back of somebody's car on March 2, 1996. During cross-examination, Allen testified that she and Davenport had gone to Esther Stone's home together, and that she had seen Craig touch Davenport's leg a "few times."

{¶ 13} Eran Riggins lived at the Lindsay home for two weeks during February and March 1996. While he was there, Riggins saw Duane Craig, the defendant's brother, lying on top of Davenport. Riggins never saw Donald Craig do anything inappropriate with Davenport. During cross-examination, Riggins testified that Craig told him that Davenport was fast and loose.

{¶ 14} On March 19, 1996, after seeing Davenport's picture in the paper, Yashica Clark notified police that she had seen Davenport and another girl walking down the street near the corner of Bittman and Maple Street on March 2, 1996. During cross-examination, Clark testified that she was "not absolutely sure" that the girl she had seen was Davenport.

{¶ 15} During February and March 1996, Frederick Frazier lived near Bittman and Maple Street. Frazier admitted that he was a suspect in Davenport's murder, stating that police officers had questioned him several times and that he had provided hair and blood samples.

{¶ 16} During February and March 1996, Maurice Cummings was homeless, but sometimes stayed with a friend who lived "around the corner" from the building where Davenport's body had been found. Cummings testified that he was a suspect in Davenport's murder, that police officers had interviewed him, and that he had provided hair and blood samples.

{¶ 17} Beverly Bacote lived behind the duplex where Davenport's body was found. Cummings lived three doors down from Bacote's residence. Bacote testified that she had seen Cummings walking near the duplex where the body was found on March 5, but that she had not seen Cummings and Davenport together. Akron Detective Steven Geiger interviewed Bacote during the homicide investigation. He testified that Bacote told him that she had seen Cummings talking to Davenport near the South Maple Street duplex on March 2.

{¶ 18} Evidence collected during the investigation and the autopsy was sent for testing to the Ohio Bureau of Criminal Identification and Investigation ("BCI"). Semen was found in a stain on the crotch of Davenport's underwear. The tests conducted at BCI did not establish a link between Craig, or the other suspects, and Davenport's murder.

{¶ 19} There was no further DNA testing by BCI because the agency did not perform DNA typing in 1996. Subsequently, the vaginal and rectal swabs and blood swatches from Davenport, blood swatches from the suspects, and a cutting from Davenport's underwear were submitted to Cellmark Laboratory for DNA testing. Only a few sperm cells could be extracted from the underwear. The forensic examiner was unable to obtain sufficient DNA from the sperm fractions to type and use for comparison.

{¶ 20} Davenport's murder was unsolved for several years. In January 2002, as a result of reviewing cold-case files, Akron Detective James Pasheilich resubmitted some of the forensic evidence to BCI for new DNA testing. Linda Eveleth, a DNA examiner at BCI, testified that she used a type of DNA testing (short tandem repeat polymerase chain reaction) that had not been available in 1996. DNA tests were conducted on the blood samples from the suspects, on the underwear, and on the rectal and vaginal swabs. Testing established that "[t]he DNA profile from the sperm fraction of the panties * * * is a mixture consistent with contributions from Roseanna Davenport * * * and Donald Craig." Further testing established that "[t]he partial DNA profile from the sperm fraction of the vaginal swab * * * is a mixture. The partial major DNA profile is consistent with Donald Craig * * *. The partial minor profile is consistent with Roseanna Davenport." According to Eveleth, the probability of a particular individual contributing to the partial major DNA profile identified from the sperm fraction of the vaginal swab was one in 973,700,000,000,000 Caucasians, one in 222,200,-000,000,000 African–Americans, and one in 4,005,000,000,000,000 Hispanics.

{¶ 21} The grand jury indicted Craig for the aggravated murder of Roseanna Davenport while committing or attempting to commit kidnapping or rape. The count also contained three death-penalty specifications: (1) murder while committing, attempting to commit, or fleeing after committing rape, and Craig was the principal offender in the commission of the murder, in violation of R.C.

2929.04(A)(7), (2) murder while committing, attempting to commit, or fleeing after committing kidnapping, and Craig was the principal offender in the commission of the murder, in violation of R.C. 2929.04(A)(7), and (3) murder for the purpose of escaping detection or apprehension for the rape or kidnapping, in violation of R.C. 2929.04(A)(3). Craig was also charged with three counts of rape: count two charged rape, by vaginal intercourse, of a person under the age of 13; count three charged rape, by anal intercourse, of a person under the age of 13; and count four charged rape, by fellatio, of a person under the age of 13. Count five charged Craig with kidnapping of a person under the age of 13.

{¶ 22} At Craig's arraignment, a magistrate, on Craig's behalf, entered a plea of not guilty to all the charges. The jury found Craig guilty of the charges and recommended the death penalty.

{¶ 23} The cause is now before this court upon an appeal as of right.

{¶ 24} *Motion to suppress DNA evidence.* In proposition of law I, Craig argues that the trial court erred in failing to exclude the DNA test results because his blood samples had been obtained in violation of the Fourth Amendment to the United States Constitution. On March 11, 1996, Judge Maxson, of the Akron Municipal Court, signed an order requiring Craig "to submit to the taking of hair, saliva and blood samples." Upon being served with the court order later that evening, Craig told police that, on the advice of counsel, he would not submit to the taking of any body samples. On March 12, an order was issued for Craig's arrest for contempt of court and a search warrant was authorized for the taking of Craig's blood, hair, and saliva samples.

{¶ 25} Officer Gerald Kelley listed the following facts and circumstances in the affidavit requesting the search warrant:

{¶ 26} "3. Affiant states that he is aware through incident * * * and investigative reports of the Akron Police Department that Rosanna Davenport, age 12, died at the location of 156 South Maple Street, Akron, Summit County, Ohio and that her body was discovered on March 5, 1996. * * * Affiant attended the autopsy of said child, which autopsy revealed that the child had been raped anally and vaginally, and that her anus was expanded to an extreme measure. Samples of suspect semen were recovered and sent to Ohio BCI & I.

{¶ 27} "4. The APD report of the statement of Michelle Lindsey states that Lindsey witnessed the victim at the home of Donald Craig the two weeks before the discovery of the victim's body. Lindsey [s]tates the victim left the home at that time. Lindsey is the girl friend of Craig and lives at the 111 Maple Street premises. Det. Smith, however, spoke to Donald Craig after the body was discovered. Craig denied knowing Davenport even though she stayed at his house shortly before her death. The last confirmed sighting of Davenport alive was by Susan Hackathorn on the date of March 2, 1996 at the location of 126

South Maple Street. * * * Justin Flanagan, age 12, also saw Davenport on such date in the same area. Flanagan also believed he saw her on the 4th of March * * *.

{¶ 28} "5. Affiant is aware that Donald had been accused on three earlier occasions of illegal sexual contact, certain of the prior allegations involving minor victims. Affiant is also aware that Craig has spent time in the Grafton State Correctional Facility."

{¶ 29} Later on March 12, police officers contacted Craig, who again refused to provide samples. Craig was then arrested pursuant to the contempt citation and the search warrant and was taken into custody. On March 13, Craig appeared in court, where he was informed that he would remain in jail until the search warrant had been executed and until he agreed to provide the samples. Craig then agreed to provide body samples and was taken to a hospital, where the samples were taken. Thereafter, the contempt charges were dismissed, and Craig was released from jail.

{¶ 30} In a motion to suppress, the defense sought to exclude the DNA evidence. The trial court overruled the motion, stating: "Considering the totality of the information contained in the affidavit, any magistrate or judge would have a substantial basis to make a probable cause determination. The statements in the affidavit are not mere conclusions. The affidavit furnishes details about the crime and why law enforcement believes that Donald Craig may have committed the homicide. After reviewing the affidavit as a whole, the Court finds there was a substantial basis for Judge Carr to make her probable cause determination in her role as a neutral and detached magistrate."

{¶ 31} Craig argues that his body samples were taken in violation of the Fourth Amendment because the samples were obtained based on a court order and not on a search warrant. The search warrant was issued on March 12. Craig was brought into court on the next day, when he was advised that he would remain in jail until he complied with the search warrant and provided the samples. It is clear that the search warrant, not the court order, was the basis for obtaining Craig's samples on March 13.

{¶ 32} Craig also argues that the samples could not have been taken pursuant to the search warrant because the warrant was not served on him and the inventory page was never completed. The record shows, however, that the warrant was duly issued and that the police officers had a copy of it when they went to Craig's residence. Moreover, the judge discussed the meaning and effect of the warrant when Craig was brought into court the next day, prior to the taking of the samples. It is not clear from the record whether the warrant was served on Craig. The inventory page was never completed. We conclude that Craig suffered no prejudice from these technical violations. He actually received

greater notice than that given in a warrant because he was brought before the judge who issued the warrant. These technical violations do not rise to the level of constitutional error. See *State v. Wilmoth* (1986), 22 Ohio St.3d 251, 262, 22 OBR 427, 490 N.E.2d 1236 (police failure to submit a written affidavit to obtain a search warrant was not a violation of constitutional magnitude); *State v. Downs* (1977), 51 Ohio St.2d 47, 5 O.O.3d 30, 364 N.E.2d 1140, paragraph eight of the syllabus (exclusionary rule does not apply when officers fail to return a search warrant and prepare an inventory pursuant to Crim.R. 41(D) and (E)).

{¶ 33} Craig also argues that the affidavit supporting the search warrant was insufficient to establish probable cause. In *Illinois v. Gates* (1983), 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court stated: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." In *State v. George* (1989), 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph two of the syllabus, we stated: "In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant."

{¶ 34} The affidavit stated that Roseanna Davenport had been at Craig's residence in the weeks before she disappeared, that her body had been found in an unoccupied apartment near Craig's residence, and that when police questioned Craig after Davenport's body had been found, he "denied knowing Davenport even though she stayed at his house shortly before her death." The affidavit also stated that Davenport had been raped, that semen samples had been recovered during the autopsy, and that those samples had been sent to BCI for testing. Finally, the affidavit stated that Craig had been accused of sexual contact with minor victims on at least three separate occasions and that Craig had spent time in a correctional facility. See *United States v. Taylor* (C.A.1, 1993), 985 F.2d 3, 6 ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination").

{¶ 35} The facts in the affidavit gave the judge issuing the warrant a substantial basis for concluding that a fair probability existed that comparison of Craig's hair, blood, and saliva with the semen evidence would identify Craig as the perpetrator. Thus, the affidavit supported the determination of probable cause. Finally, "the deference accorded the magistrate's determination of probable cause" compels us to conclude that the search warrant was valid. See *State v.*

*Jordan,* 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 43, citing *George,* 45 Ohio St.3d 325, 544 N.E.2d 640, paragraph two of the syllabus.

{¶ 36} We reject proposition of law I.

{¶ 37} *"Other acts" evidence of rape.* In proposition of law II, Craig argues that the trial court erred in admitting evidence that Craig had previously raped Lavail Calhoun. Over defense objection, Lavail Calhoun testified that she had met Craig in 1991 when she was 17 years old. Calhoun stated that Craig came by her house one evening, and while they were going to the store, Craig stopped at a house where "[h]e said he was house sitting for somebody." After checking the house, Craig told Calhoun that the house had been broken into and drove to a pay phone to call the police. They then returned to the house. Calhoun asked to use the bathroom, and they both entered the house.

{¶ 38} Inside the house, Craig threw a sheet over Calhoun, carried her to a second-story bedroom, and flung her on a bed. While taking Calhoun upstairs, Craig told her to be quiet or he was going to kill her. Craig tied Calhoun's hands to the bedposts, taped her mouth shut, and removed her pants and underwear. He then vaginally raped Calhoun and unsuccessfully tried to anally rape her.

{¶ 39} When Craig finished, he untied Calhoun. She got dressed, and he drove her home. Calhoun's mother then called the police and reported the attack. After being examined at the hospital, Calhoun took police to the house where the attack had occurred. She later testified before a grand jury. The grand jury returned a no bill, and Craig was never prosecuted for Calhoun's rape.

{¶ 40} Akron Police Officer Jerry Hughes testified that on April 28, 1991, Calhoun reported that she had been raped by a black male named "Donald" and that she had provided a description of him. On the way to the hospital, Calhoun showed Officer Hughes the house where the attack had occurred and said that the man had been driving a gray Volvo.

{¶ 41} Akron Police Officer Gerald Miles testified that on May 7, 1991, when he went to Craig's residence to assist in serving a felony warrant, Craig had been arrested. At the time of the arrest, a gray Volvo was parked in Craig's driveway.

{¶ 42} The trial court admitted Calhoun's medical records from Akron Children's Hospital relating to her medical treatment and condition following the rape.

{¶ 43} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510

N.E.2d 343, paragraph two of the syllabus. In order "[t]o be admissible to prove identity through a certain *modus operandi*, other-acts evidence must be related to and share common features with the crime in question." *State v. Lowe* (1994), 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus. See *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus.

{¶ 44} Several common features link Davenport's murder and the incident with Calhoun. Both victims were young girls. Craig took both victims to a vacant building, where he restrained and raped them. Craig vaginally raped both victims, anally raped Davenport, and attempted to anally rape Calhoun. Craig allowed Calhoun to get dressed after she was raped and apparently did the same for Davenport. The evidence of the first rape tends to show the identity of the perpetrator of the second. Therefore, evidence of Craig's prior rape of Calhoun meets the requirements for admissibility in order to show proof of identity, as permitted by Evid.R. 404(B). See *State v. Shedrick* (1991), 61 Ohio St.3d 331, 338, 574 N.E.2d 1065 (sufficient commonality existed between prior rape and charged rape to permit evidence of prior rape to prove identity, plan, scheme, or system). There were differences between the rape of Calhoun and the rape and murder of Davenport, but "[a]dmissibility is not adversely affected simply because the other [crimes] differed in some details." *Jamison*, 49 Ohio St.3d at 187, 552 N.E.2d 180. Accord *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 46.

{¶ 45} Calhoun's testimony also helped to establish Craig's motive for murdering Roseanna to escape detection or apprehension. See Evid.R. 404(B). After Calhoun was raped and released, she immediately notified police that Craig had raped her, and he was arrested. The evidence supports the state's argument that Craig killed Davenport so that she could not notify the police that he had kidnapped and raped her.

{¶ 46} Craig argues that Calhoun's testimony was inadmissible because the 1991 rape and the 1996 rape-homicide were too removed in time. In *State v. DePina* (1984), 21 Ohio App.3d 91, 92, 21 OBR 97, 486 N.E.2d 1155, the court of appeals stated that although "other acts evidence aimed at showing an idiosyncratic pattern of conduct should not be so remote from the offense charged as to render them non-probative, logic does not require that they necessarily be near the offense at issue in both place and time. * * * The key to the probative value of such conduct lies in its peculiar character rather than its proximity to the event at issue." We conclude that the five-year separation in time between these two incidents does not preclude the admissibility of the evidence.

{¶ 47} Moreover, the trial court instructed the jury:

{¶ 48} "Evidence was received about the commission of other acts alleged to have been committed by the defendant in 1991 involving Lavail Calhoun. That

evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character in this case.

{¶ 49} "If you find that the evidence of the other acts is true and that the defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves, one, the defendant's motive, intent, or purpose to commit the crime of aggravated murder charged in this trial, or two, the identity of the person who committed the offenses in this trial.

{¶ 50} "This evidence cannot be considered by you for any other purpose."

{¶ 51} A similarly worded cautionary instruction was provided to the jury before Calhoun testified. In view of these instructions and the probative value of Calhoun's testimony, we conclude that the trial court did not abuse its discretion in admitting this "other acts" evidence.

{¶ 52} Finally, Craig argues that Calhoun's testimony was inadmissible because the grand jury returned a no bill on the rape charges. "Other acts" evidence need be proved only by substantial proof. *Jamison*, 49 Ohio St.3d at 187, 552 N.E.2d 180. Thus, the grand jury's disposition of the rape charges did not affect the admissibility of Calhoun's testimony at Craig's trial. See *Dowling v. United States* (1990), 493 U.S. 342, 349–350, 110 S.Ct. 668, 107 L.Ed.2d 708 ("other acts" evidence not barred even though the accused had previously been acquitted of the crime).

{¶ 53} We reject proposition of law II.

{¶ 54} ***Witness's sexual history.*** In proposition of law IV, Craig argues that the trial court erred in not allowing him to question Calhoun about her sexual history. Calhoun's medical records relating to her treatment following the rape were offered as state's exhibit 122. The records indicated that Calhoun had had sexual intercourse about two weeks prior to the rape. Her physical examination revealed an old hymenal tear. Older medical charts showed that Calhoun had been treated after she was hit in the face by a drunk uncle and for ETOH (ethyl alcohol) abuse.

{¶ 55} Before Calhoun testified, the defense argued that the introduction of Calhoun's medical records would enable it to question her about her sexual activity around the time of the rape. The trial court ruled that the defense could not ask Calhoun about her prior sexual activity. The trial court permitted the reference to the hymenal tear to remain in the medical records but ordered the prosecutor to redact references to Calhoun's prior sexual activity, the ETOH poisoning, and the assault by the drunk uncle. The reference to the ETOH poisoning and the attack by the drunk uncle were removed from state's exhibit 122. The prosecutor, however, failed to remove the reference to Calhoun's prior

sexual intercourse. No prejudice to Craig resulted because that evidence could only have benefited the defense.

{¶ 56} Craig argues that he had the right to question Calhoun about her sexual history to show that he was not responsible for the hymenal tear mentioned in her medical records. He also claims that the jury was entitled to hear that evidence because the rape charge against him had not been prosecuted.

{¶ 57} R.C. 2907.02(D), Ohio's rape shield statute, provides:

{¶ 58} "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."

{¶ 59} "Evidence of the victim's prior sexual activity with a person other than the defendant is inadmissible unless it relates to the 'origin of semen, pregnancy, or disease.'" *State v. Ferguson* (1983), 5 Ohio St.3d 160, 164, 5 OBR 380, 450 N.E.2d 265, quoting R.C. 2907.02(D). Craig's purpose for questioning Calhoun about her past sexual activity does not meet any of the exceptions to the rape shield law. Craig did not allege that he had previously engaged in sexual relations with Calhoun, and Calhoun denied having sexual activity with Craig other than when he raped her. Thus, the reference to the hymenal tear in Calhoun's medical records had nothing to do with her alleged rape by Craig. Accordingly, we conclude that trial court did not abuse its discretion by not permitting the defense to question Calhoun about her sexual history.

{¶ 60} We reject proposition of law IV.

{¶ 61} *Evidence of drug use.* In proposition of law III, Craig argues that he was deprived of a fair trial because the state presented evidence of his illicit drug use. Michelle Lindsay testified that she and Craig had smoked crack cocaine and marijuana when they lived together in 1996. The defense did not object to this testimony; therefore, Craig has forfeited all but plain error. Crim.R. 52(B); *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 44. Even though Lindsay's testimony about Craig's drug use was irrelevant and tended to portray Craig in a negative light, no plain error resulted from admitting the testimony. *Gross* at ¶ 48 ("other act" of purchasing crack cocaine was of minor significance compared to the gravity of the aggravated murder counts).

{¶ 62} We reject proposition of law III.

{¶ 63} *Excluding evidence about another suspect.* In proposition of law V, Craig argues that he was denied the right to elicit testimony that another suspect

might have raped and murdered Davenport. Before Detective Washington Lacy testified, the state sought to prohibit the defense from eliciting information that at the time of Davenport's murder, Aaron Trent, the victim's uncle, was under investigation for raping her. The defense argued that this evidence would show why Trent had been a suspect for Davenport's rape and murder.

{¶ 64} The trial court ruled that testimony about the earlier rape met none of the criteria for admissibility under R.C. 2907.02(D). The trial court found that "such evidence would be more prejudicial than probative, and inflammatory, and confuse the jury in this case." The trial court then ordered the defense not to introduce any testimony about the earlier rape or cross-examine any of the state's witnesses about that incident.

{¶ 65} During a subsequent proffer, trial counsel stated that they would have asked Detective Lacy "why Aaron Trent was considered a suspect, why he was interviewing him, and specifically if he had knowledge * * * of the rape investigation that was still ongoing at the time of Rosie Davenport's death." Trial counsel also averred that Detective Jan Falcone, the police investigator on the earlier rape charge, would have testified that Trent was a suspect in Davenport's murder.

{¶ 66} Craig argues that the rape shield statute does not prevent him from presenting evidence that Trent was under investigation for an earlier rape of Davenport. He argues that restricting the admission of this evidence violated his right to confront witnesses against him and infringed on his ability to present a defense. "The rights to confront witnesses and to defend are not absolute and may bow to accommodate other legitimate interests in the criminal process." *State v. Boggs* (1992), 63 Ohio St.3d 418, 422, 588 N.E.2d 813. In determining whether the rape shield law would unconstitutionally infringe on a defendant's rights, a court must "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." *State v. Gardner* (1979), 59 Ohio St.2d 14, 17, 13 O.O.3d 8, 391 N.E.2d 337.

{¶ 67} Several legitimate state interests are advanced by the rape shield law. "First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process." Id. The state's interests must then be balanced against the accused's rights to confront his accusers and to defend himself.

{¶ 68} The defense purpose for introducing evidence about the prior rape allegation was to cast suspicion on Trent for Davenport's rape and murder. But

no evidence linked the previous rape or Trent with the current charges. Thus, testimony about the earlier rape was not probative and had no bearing on Craig's defense. Further, Craig's claims are speculative. The defense argues that police officers would have testified that Trent was under investigation for the earlier rape of Davenport. No evidence was proffered showing that Trent was guilty of that offense. Defense counsel acknowledged that at the time of Davenport's death no arrests had been made for the earlier rape allegations.

{¶ 69} In *Holmes v. South Carolina* (2006), 547 U.S. ——, 126 S.Ct. 1727, 164 L.Ed.2d 503, the defendant was convicted of murder based primarily on forensic evidence. At trial, the judge precluded the defendant from introducing evidence that a third party had been in the neighborhood at the time of the murder, and that the third party had either acknowledged the defendant's innocence or admitted to committing the crimes himself. The state supreme court upheld the trial court's evidentiary ruling on the ground that " 'where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence.' " 547 U.S. at ——, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503. In reversing the conviction, the Supreme Court held that the rule excluding defense evidence based on the strength of the prosecution's case was arbitrary and improperly denied the defendant his constitutional right to have " 'a meaningful opportunity to present a complete defense.' " 547 U.S. at ——, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503, quoting *Crane v. Kentucky* (1986), 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636, quoting *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413.

{¶ 70} In this case, the trial court did not exclude evidence about Trent based on the application of an arbitrary rule. The trial court excluded testimony about the earlier rape only after finding that the evidence was more prejudicial than probative, was inflammatory, and would confuse the jury. The trial court's ruling was based on well-established rules of evidence, which the *Holmes* court emphasized could have been properly applied. 547 U.S. at ——, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503. The state's interests in promoting the rape shield law were not outweighed by speculative evidence of a prior rape that was not connected to Davenport's murder. We conclude that the trial court did not abuse its discretion by excluding the evidence about the earlier rape allegations.

{¶ 71} Finally, we consider whether Davenport's death eliminates the underlying purposes of the rape shield law, which includes guarding the victim's sexual privacy and protecting her from embarrassment at trial. No part of the rape shield law suggests that a deceased victim's sexual history is less protected than that of a living victim. See *State v. Clowney* (1997), 299 N.J.Super. 1, 14, 690 A.2d 612 ("The statutory goals of protecting the privacy of the victim and seeking

to avoid character assassination are no less consequential when the rape victim is killed"). See, also, *Jenkins v. State* (Ind.1993), 627 N.E.2d 789, 795 ("The goal is to promote the reporting of the crime. If the statute is not applied to victims who ultimately are murdered, then perpetrators of sex crimes will be encouraged to kill their victims, thus enabling them to defend the charges through exploitation of evidence of the victim's prior sexual activity"). Other jurisdictions have also concluded that the victim's death does not negate the rape shield law. E.g., *State v. Lackey* (2005), 280 Kan. 190, 222, 120 P.3d 332; *Holland v. State* (Miss.1991), 587 So.2d 848, 863. We agree with the majority view and conclude that the state interests underlying the rape shield law are not eliminated when the victim has died.

{¶ 72} We reject proposition of law V.

{¶ 73} *Medical examiner's testimony.* In proposition of law VI, Craig argues that the trial court violated his Sixth Amendment right to confront witnesses against him by allowing Dr. Lisa Kohler, the Summit County medical examiner at the time of the trial, to testify about Davenport's autopsy even though Dr. Roberto Ruiz, Chief Deputy Coroner for Summit County at the time of Davenport's murder, had conducted the autopsy. Dr. Ruiz retired before Craig's trial. Before testifying about the autopsy, Dr. Kohler stated that she had reviewed all the materials prepared in connection with Davenport's autopsy. The defense objected, arguing that Dr. Kohler lacked firsthand knowledge of the autopsy. In overruling this objection, the trial court stated:

{¶ 74} "By statute, the medical examiner and/or coroner is charged by Ohio law with giving an opinion regarding the manner and method of death in this case.

{¶ 75} "The court finds that Dr. Kohler has reviewed all of the pertinent aspects of this autopsy and is qualified to render expert opinions regarding this matter."

{¶ 76} During her testimony, Dr. Kohler described the external and internal examination of Davenport's body, the multiple injuries that she had suffered, the various tests that the medical examiner's office had conducted during the autopsy, and the results of those tests. She also identified the numerous photographs taken during the autopsy. Dr. Kohler provided her expert opinion on the cause of death and time of death and testified that Davenport had injuries consistent with vaginal and anal penetration. The trial court admitted the autopsy report into evidence.

{¶ 77} "Pursuant to Evid.R. 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse of discretion." *State v. Hartman* (2001), 93 Ohio St.3d 274, 285, 754 N.E.2d 1150. Under Evid.R. 703, "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or

admitted in evidence at the hearing." Expert opinions "may be based on perceptions *or* facts or data admitted in evidence." (Emphasis sic.) *State v. Solomon* (1991), 59 Ohio St.3d 124, 126, 570 N.E.2d 1118. Dr. Kohler's expert testimony was based in whole or major part on facts and data that she reviewed in the autopsy report. See id., syllabus. That report was admitted into evidence. Dr. Kohler's expert opinions as to the nature of Davenport's injuries, the time of her death, and the cause of death were based upon her knowledge and experience, as applied to the facts and data included in the autopsy report. We conclude that the trial court did not abuse its discretion by permitting Dr. Kohler to testify as an expert.

{¶ 78} Craig argues that Dr. Kohler should not have been allowed to testify because there was no showing that Dr. Ruiz was unavailable to testify. The presentation of expert testimony, however, has no unavailability requirement. See Evid.R. 702. An expert witness can testify even if a more qualified expert might be available. See *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 10 O.O.3d 539, 384 N.E.2d 296.

{¶ 79} Finally, Dr. Kohler's expert testimony did not deny Craig his right to confrontation. The jury was fully aware that Dr. Kohler had not personally conducted or been present during Davenport's autopsy. Moreover, the defense had the opportunity to question Dr. Kohler about the procedures that were performed, the test results, and her expert opinion about the time and cause of death. See *State v. Eley* (1996), 77 Ohio St.3d 174, 181, 672 N.E.2d 640 (defendant not denied right to confrontation where a coroner who was present at the autopsy but did not conduct the procedure testified about it and its results). See, also, *State v. Boyd* (May 28, 1992), Cuyahoga App. No. 60639, 1992 WL 114592 (defendant not denied right to confrontation where coroner who did not conduct the autopsy was permitted to testify).

{¶ 80} We also conclude that the autopsy report was admissible. R.C. 313.10 provides that certified records of a coroner are public records and shall be received as evidence in any criminal or civil court. The autopsy report is also admissible as a business record under Evid.R. 803(6). See *State v. Bradley* (June 15, 1995), Cuyahoga App. Nos. 67430 and 67438, 1995 WL 363816.

{¶ 81} In *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, the Supreme Court held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177. Because *Crawford* distinguished between testimonial and nontestimonial statements, we must determine whether the autopsy report is testimonial or nontestimonial. Although the court did not provide a comprehensive definition of testimonial statements, it

indicated that business records are, "by their nature," not testimonial. Id. at 56, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 82} An autopsy report, prepared by a medical examiner and documenting objective findings, is the "quintessential business record." *Rollins v. State* (2005), 161 Md.App. 34, 81, 866 A.2d 926. "The essence of the business record hearsay exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are 'by their nature' not prepared for litigation." *People v. Durio* (2005), 7 Misc.3d 729, 734, 794 N.Y.S.2d 863.

{¶ 83} Most jurisdictions that have addressed the issue under *Crawford* have found that autopsy reports are admissible as nontestimonial business or public records. See *Moreno Denoso v. State* (Tex.App.2005), 156 S.W.3d 166, 180–182 (autopsy report was not testimonial and was admissible without the deceased pathologist's testimony); *Durio*, 7 Misc.3d at 734–737, 794 N.Y.S.2d 863 (autopsy report was nontestimonial and its admission without the testimony of the medical examiner who performed the autopsy did not violate *Crawford* ); *State v. Cutro* (2005), 365 S.C. 366, 378, 618 S.E.2d 890 (autopsy report was nontestimonial).

{¶ 84} Some jurisdictions have resolved the *Crawford* issue by distinguishing between objective factual findings, which are considered nontestimonial, and opinions and conclusions, which are considered testimonial. See *Lackey*, 280 Kan. at 213–214, 120 P.3d 332; *Rollins*, 161 Md.App. at 82, 866 A.2d 926. In *Rollins*, a medical examiner who did not perform the autopsy testified about the results of the autopsy. The trial judge redacted those portions of the report that constituted opinions or conclusions, including reference to the cause and manner of death. On appeal, *Rollins* found that the defendant's right to confrontation was not violated because the remaining findings in the autopsy report did not constitute testimonial evidence, as contemplated by *Crawford*. Id. In so holding, *Rollins* stated:

{¶ 85} "[T]he findings in an autopsy report of the physical condition of a decedent, which are routine, descriptive and not analytical, which are objectively ascertained and generally reliable and enjoy a generic indicium of reliability, may be received into evidence without the testimony of the examiner. Where, however, contested conclusions or opinions in an autopsy report are central to the determination of *corpus delecti* or criminal agency and are offered into evidence, they serve the same function as testimony and trigger the Sixth Amendment right of confrontation." Id.

{¶ 86} At least one court has found that a defendant's confrontation rights were violated when the autopsy report was admitted without the testimony of the medical examiner who performed the autopsy, but only under certain circumstances. *Smith v. State* (Ala.Crim.App.2004), 898 So.2d 907, 915–916. In *Smith*,

the court found that the defendant's confrontation rights were violated because the prosecution was permitted to prove the cause of death, a crucial element of the charge, without providing the defendant with the opportunity to cross-examine the pathologist who originally performed the autopsy. Even so, the court found that *Crawford* was not implicated because the records were not testimonial and that the violation was harmless error. Id. at 917–918.

{¶ 87} In *State v. Delaney* (2005), 171 N.C.App. 141, 613 S.E.2d 699, an expert testified that substances found on a defendant's property were marijuana and opium. The expert's conclusions were based on analyses conducted by a chemist who did not testify. The court held that the expert's opinion was admissible. "Since it is well established that an expert may base an opinion on tests performed by others in the field and [that the defendant] was given an opportunity to cross-examine [the expert] on the basis of his opinion, we conclude that there has been no violation of [the defendant's] right of confrontation under the rationale of *Crawford.*" Id. at 144, 613 S.E.2d 699.

{¶ 88} We agree with the majority view under *Crawford* and conclude that autopsy records are admissible as nontestimonial business records. We conclude that Dr. Kohler's expert testimony about the autopsy findings, the test results, and her opinion about the cause of death did not violate Craig's confrontation rights.

{¶ 89} We reject proposition of law VI.

{¶ 90} ***Gruesome photographs.*** In proposition of law VII, Craig argues that the trial court erred in admitting gruesome autopsy and crime-scene photographs of the victim during both phases of the trial. Nonrepetitive photographs, even if gruesome, are admissible in capital cases as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 91} Craig complains that the trial court erred in admitting three gruesome crime-scene photographs. State's exhibit 11 depicts the lower part of Davenport's clothed body; none of her upper body or head wounds are visible. State's exhibit 14 shows the injuries to Davenport's torso and shows that her bra was rolled up above her breast area. State's exhibit 15 is a close-up of Davenport's facial area, which shows her head leaning back, her mouth open, and ligature marks around her neck.

{¶ 92} State's exhibit 11 is not gruesome and supports the state's theory that Craig allowed Davenport to get dressed after he raped her. State's exhibits 14 and 15 depicted the wounds inflicted and, although gruesome, were probative of

Craig's intent and the manner and circumstances of Davenport's death. See *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 85. We conclude that the trial court did not abuse its discretion in admitting these photographs.

{¶ 93} Craig contends that the trial court erred in admitting 16 autopsy photographs. State's exhibit 59 shows ligature marks around the right side of Davenport's neck, an abrasion on her nose, and an injury to her upper lip. State's exhibit 65 shows a ligature mark on the left side of Davenport's neck. These photographs were probative of the manner of death and Craig's specific intent to kill. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 87.

{¶ 94} State's exhibits 66 and 68 depict two different views of Davenport's body prior to the autopsy. These full body views show wounds to her neck, face, torso, and leg. State's exhibit 69 presents a close-up of Davenport's torso and shows injuries to the back of her hand and her chest. These photos illustrated the medical examiner's testimony and provided an overall perspective of the victim's wounds. See *Hartman*, 93 Ohio St.3d at 289, 754 N.E.2d 1150.

{¶ 95} State's exhibit 75 depicts an abrasion on the victim's right arm. State's exhibit 76 is not gruesome and presents a close-up of the same wound. State's exhibits 82 and 83 depict contusions under the scalp that were observed after the skin was reflected from the skull. These exhibits support the coroner's testimony about Davenport's injuries.

{¶ 96} State's exhibits 84 and 85 show bruises and lacerations around Davenport's genital area. State's exhibits 86 through 90 show bruising and multiple tearing around the victim's anal opening. Although gruesome, these photographs supported Dr. Kohler's testimony about vaginal and anal penetration, showed the force involved, and thus helped to prove that Davenport had been anally and vaginally raped.

{¶ 97} We conclude that the trial court could have reasonably found that the substantial probative value of each of the autopsy photographs outweighed any prejudicial impact on the jury. Thus, the trial court did not abuse its discretion in admitting these photographs. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 90; *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 74.

{¶ 98} Based on the same reasoning, we also conclude that the trial court did not abuse its discretion in allowing state's exhibits 59, 65, 75, 76, and 84 through 90 into evidence during the penalty phase. *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542.

{¶ 99} We reject proposition of law VII.

{¶ 100} ***Prosecutorial misconduct.*** In proposition of law VIII, Craig argues that the prosecutor committed prosecutorial misconduct during his penalty-phase closing argument. The test for prosecutorial misconduct in closing arguments is " 'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hessler* (2000), 90 Ohio St.3d 108, 125, 734 N.E.2d 1237, quoting *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. Craig failed to object to the remarks and thus waived all but plain error. *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus.

{¶ 101} Craig claims that the prosecutor improperly argued that testimony about his good family background had no mitigating value. The prosecutor stated:

{¶ 102} "You heard, this guy had a fine family. They were supportive. They were emotionally supportive. They were there for him. He was there for them, apparently.

{¶ 103} "How in any way is that mitigating to what he did to this child? How is that mitigating?

{¶ 104} "The circumstances you have to consider are the rape, the kidnapping, and the fact that that was done to avoid detection for those crimes.

{¶ 105} "How in any way is the fact that he was raised in a stable family with a church background mitigating?

{¶ 106} "How does that lessen his blame?

{¶ 107} "That actually makes it worse.

{¶ 108} "You all are sitting there, and maybe have similar upbringings. Maybe had a background that was a supportive family. You were educated. You were given every opportunity.

{¶ 109} "He took that ability, he took the common sense that he had, he took the brains that he had, he took everything that his family apparently gave him, including a background in religion, and threw it away to do this. To do this."

{¶ 110} The defense presented mitigating evidence that Craig came from a stable home, attended church, and graduated from high school. In response, the prosecutor argued that Craig's upbringing was entitled to little weight in mitigation because he squandered the advantages he had received. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292. Moreover, "counsel for both parties are afforded wide latitude during closing argument." *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523. The prosecutor did not commit plain error, or any error, in making this argument.

{¶ 111} Craig also claims that the prosecutor improperly appealed to the fears and passions of the jury when the prosecutor stated:

{¶ 112} "The legislature allowed these particular specifications to exist so that the death penalty would be appropriate, so that the death penalty would be considered, just as you are doing now.

{¶ 113} "And it was done because children should be able to walk the streets. Children shouldn't be murdered after being raped and after being kidnapped. And that's why the legislature has allowed this penalty for this type of crime."

{¶ 114} The prosecutor's rebuttal argument responded to issues raised during the defense's closing argument and to defense claims that the death penalty is uncivilized. Counsel for the defense had asked, "[H]ow can we expect our children to respect the sanctity of human life if we are teaching our youngsters that it is okay to kill other human beings because they killed somebody[?]" The prosecutor's remarks regarding the aggravating circumstances represented fair comment. See *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 183 (prosecutor's argument that shooting a police officer was an aggravating circumstance to "preserve the public tranquility" was fair comment). We conclude that the prosecutor's rebuttal argument was not plain error. See *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 76.

{¶ 115} We reject proposition of law VIII.

{¶ 116} *Merger.* In proposition of law IX, Craig argues that the trial court erred when it refused to merge the kidnapping and rape specifications or the rape and kidnapping offenses. Craig contends that *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, requires the offenses and specifications to be merged because they were committed with a single animus.

{¶ 117} Before sentencing, the defense requested that the rape and kidnapping charges be merged into the aggravated murder charge. The trial court rejected the request, stating that "the kidnapping was not merely incidental to the rapes, but significantly independent of them." The test for determining whether kidnapping and rape were committed with a separate animus as to each is "whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense." Id. at 135, 14 O.O.3d 373, 397 N.E.2d 1345. "Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions." Id. at subparagraph (b) of the syllabus. In *Logan* and in subsequent cases, we have said that prolonged restraint, secretive confinement, or substantial movement of the victim apart from that involved in the other crime were factors establishing a separate animus for kidnapping. Id. at subparagraph

(a) of the syllabus; *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 141; *Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 134.

{¶ 118} On the evening of February 28, 1996, Craig abducted Davenport as she was walking home. He then took her to the empty apartment on Maple Street or some other location where he raped her. The evidence shows that Davenport was orally, anally, and vaginally raped, and then apparently allowed to dress. Only then did Craig murder her. See *State v. Hill* (1992), 64 Ohio St.3d 313, 332, 595 N.E.2d 884 (separate animus for kidnapping where defendant forced a 12–year–old victim from a parking lot to a wooded area where he then raped and murdered him); *State v. Powell* (1990), 49 Ohio St.3d 255, 261–262, 552 N.E.2d 191 (kidnapping upheld as a separate offense where defendant lured a child from her home to a nearby building where he attempted to rape her and then killed her); cf. *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 93 (no separate animus since victim not moved from the bedroom where she was raped and murdered). We conclude that the evidence established that a separate animus existed for the kidnapping separate and apart from the rapes.

{¶ 119} We reject proposition of law IX.

{¶ 120} *Sentencing for rape and kidnapping.* In proposition of law X, Craig argues that the trial court improperly sentenced him for the rape and kidnapping offenses based upon provisions of law that were not in effect at the time these offenses were committed. Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136 ("Senate Bill 2"), became effective on July 1, 1996. This comprehensive bill changed the sentencing system in Ohio by providing precise guidance for criminal sentencing. See *State v. Comer,* 99 Ohio St.3d 463, 2003-Ohio-4165, 793 N.E.2d 473, ¶ 10. But, see, *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraphs one, three, and five of the syllabus (portions of Senate Bill 2 are unconstitutional). The General Assembly also enacted Am.Sub.S.B. No. 269, 146 Ohio Laws, Part VII, 10752, 11099, which clarified that Senate Bill 2 applies only to the sentences of individuals who commit an offense on or after July 1, 1996. See *State v. Madrigal* (2000), 87 Ohio St.3d 378, 399, 721 N.E.2d 52 (sentencing provisions of Senate Bill 2 apply only to crimes committed on or after July 1, 1996); *State ex rel. Maynard v. Corrigan* (1998), 81 Ohio St.3d 332, 333, 691 N.E.2d 280.

{¶ 121} Craig argues that because his offenses were committed in February and March 1996, he was improperly sentenced for the rape and kidnapping offenses under provisions of law that were effective only after July 1, 1996. The trial court sentenced Craig on the basis of R.C. 2929.11(A), 2929.14(A), (B), (C), and (E), and 2929.19(B)(2)(c) and (e). These provisions were not in effect until after July 1, 1996, and therefore do not apply to offenses committed before that

date. The trial court's entry shows that Craig was sentenced for the rape and kidnapping offenses based on the provisions of the Ohio Revised Code that became effective after July 1, 1996.

{¶ 122} We conclude that Craig was improperly sentenced for the kidnapping and rape offenses. Accordingly, proposition of law X has merit. We remand the cause to the trial court so that Craig can be resentenced for the rape and kidnapping offenses under the law in effect at the time the offenses were committed.

{¶ 123} *Sentence appropriateness.* In proposition of law XI, Craig argues that his death sentence is inappropriate because the aggravating circumstances do not outweigh the mitigating factors. We will discuss this argument during our independent sentence evaluation. As that discussion will explain, we reject proposition of law XI.

{¶ 124} *Proportionality.* In proposition of law XII, Craig challenges the constitutionality of Ohio's death-penalty proportionality review. This argument has been repeatedly rejected by a majority of this court. See, e.g., *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. But, see, *State v. Issa* (2001), 93 Ohio St.3d 49, 75, 752 N.E.2d 904 (Pfeifer, J., dissenting); *State v. Murphy* (2001), 91 Ohio St.3d 516, 562, 747 N.E.2d 765 (Pfeifer, J., dissenting). We reject proposition of law XII.

{¶ 125} *Constitutionality.* In proposition of law XIII, Craig challenges the constitutionality of Ohio's death-penalty statutes under both the United States Constitution and the Ohio Constitution. We summarily reject this challenge. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 126} Craig also disputes the constitutionality of lethal injection as a means to carry out the death penalty. We reject this claim. See *Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131; *Carter,* 89 Ohio St.3d at 608, 734 N.E.2d 345.

{¶ 127} Craig contends that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. These arguments also lack merit. *Issa,* 93 Ohio St.3d at 69, 752 N.E.2d 904; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643.

{¶ 128} We reject proposition of law XIII.

{¶ 129} *Independent sentence evaluation.* The evidence established beyond a reasonable doubt that Craig murdered Roseanna Davenport while committing or attempting to commit rape and kidnapping, R.C. 2929.04(A)(7), and that he

murdered her for the purpose of escaping detection, apprehension, trial, or punishment, R.C. 2929.04(A)(3).

{¶ 130} Craig called eight mitigation witnesses during the penalty phase.

{¶ 131} Charles Jones married Carolyn Jones, Craig's mother, when Craig was about 14 years old. Charles was actively involved in raising Craig and his four brothers. Charles described Craig as a "very soft-hearted, malleable young man," who attended church and Sunday school. Craig behaved very well towards Charles and his mother and helped around the house. Craig helped look after Charles's grandmother, who lived with the family after she became an amputee. Charles testified that Craig would "talk with her, spend time with her. And whatever she needed, he would get for her." Charles stated that he and Carolyn provided Craig with a stable environment. Illegal drugs were never allowed in their home, and Charles never saw any indication that Craig was using drugs while he lived at home.

{¶ 132} Carolyn Jones, Craig's mother, testified that she and Charles have been married for 29 years. She had lived in the same Akron home since 1971. Craig attended Akron public schools and graduated from South High School, where he received average grades. Craig was actively involved in church activities while growing up and was a junior deacon. While a teenager, Craig helped elderly people living in the neighborhood by mowing their grass, cleaning their garages, and shoveling snow. Craig also performed household chores around the house and had a summer job working on a farm.

{¶ 133} Ray Craig, Craig's younger brother, had a good relationship with Craig. Ray and Craig gardened, fished, played sports, and were involved in church activities together. During summers while growing up, Craig and his brothers would visit their grandfather in Birmingham, Alabama. While in high school, Craig was a tennis player and played the tuba and drums in the band. Ray and Craig remained close in adulthood and took trips, went to family reunions, and did a lot of activities together. Ray did not have any contact with his brother during the seven years that Craig was in prison.

{¶ 134} Troy Craig, Craig's youngest brother, testified that he had a "very close" relationship with all of his brothers. Troy testified that the brothers were involved in church activities and even helped to repair and remodel their church. While growing up, Craig would often bring home stray dogs and cats and take care of them. As an adult, Troy maintained regular contact with Craig until Troy moved to Atlanta, Georgia, in 1989. Even then, Troy and Craig regularly talked to each other on the phone.

{¶ 135} Lisa Griffin, Craig's sister, was 16 when she learned that she and the Craig brothers had the same father. Since learning about their relationship, Craig and Griffin have been close. Craig took Griffin to the doctor after she

broke her leg, he took her to the grocery store because she did not have a car, and he helped pay her bills when she was having problems. Craig also tried to teach Griffin how to cook, iron clothes, and fix a car.

{¶ 136} Joseph Dubina, regional administrator for the Adult Parole Authority, testified that a sentence of life in prison without parole eligibility for 20 years, or a sentence of life in prison without parole eligibility for 30 years, would require Craig to spend 20 or 30 full years in prison before he could be considered for parole.

{¶ 137} Jason LaRouche, who had worked as a correctional program specialist with the Ohio Department of Rehabilitation and Correction, conducted security reviews and had quarterly contacts with Craig when he was an inmate at the Belmont Correctional Facility. According to LaRouche, assignment to the Belmont Correctional Camp was an indication of Craig's "better than average" ability to adjust to institutional life. LaRouche does not remember Craig having any disciplinary problems. Craig worked in the food service department. His inmate evaluation reports in 2000, 2001, and 2002 rated him an excellent worker. A May 24, 2003 report rated Craig as a good worker, and the reviewer of the report said that Craig was an "acceptable worker." Craig disagreed with that evaluation and refused to sign it.

{¶ 138} Dr. Joseph Bendo, a psychologist, reviewed Craig's school, military, and prison records. Craig graduated from high school with an overall grade point average of 1.1. He served approximately eight years in the Army. He was court-martialed three times and received a dishonorable discharge. His court-martial offenses included an absence without leave for a year and one-half, assault, and theft. Craig had also been in prison for seven or eight years at the Belmont Correctional Facility.

{¶ 139} Results from the Wechsler Adult Intelligence Scale showed that Craig has a full-scale IQ of 83. Dr. Bendo testified that Craig had impaired cognitive functioning, as demonstrated by his low IQ and his low grade-point average in high school. Craig's history of substance abuse, especially alcohol abuse, also contributed to his impaired cognitive functioning.

{¶ 140} Craig experienced "trauma or early loss" while growing up. His sister died when she was two months old, and one of his brothers died from a brain tumor. Craig also reported that he experienced racial pressure, especially in junior high school. Craig has "emotional deficits" as shown by the lack of significant bonding with people outside his immediate family. Craig reported that he had "no close friends" and that he had no visitors when he was in jail. He had a history of broken relationships and a failed marriage and lacked a significant relationship with his child.

{¶ 141} Craig had a strict upbringing. According to Dr. Bendo, "[t]here seemed to be a formality or distance in the early years, and as an adult, there was very little, if any, emotional support offered." Craig also has problems with "impulse and anger control," and it was difficult for him to admit fault or shortcomings.

{¶ 142} Review of Craig's prison records shows that he adapted well to prison when incarcerated from 1996 to 2003. Craig received evaluations identifying his ability to "get along with others, help other people, and do a good job." Craig's prison records showed no indication of violent outbursts. Dr. Bendo concluded that Craig made a "very good adjustment" to prison life and "went out of his way to improve his situation in jail."

{¶ 143} Dr. Bendo testified that the general life expectancy for a black male in the United States is 68.6 years. Dr. Bendo also stated that one study showed that a sentence of 20 years in prison will take 16 years off a life expectancy. Dr. Bendo believes that there is a "very, very low probability" that Craig would be a threat to anyone if he was incarcerated for 30 years.

{¶ 144} *Sentence evaluation.* The jury convicted Craig of three death-penalty specifications: under R.C. 2929.04(A)(7), murder while committing, attempting to commit, or fleeing after committing rape; under R.C. 2929.04(A)(7), murder while committing, attempting to commit, or fleeing after committing kidnapping; and under R.C. 2929.04(A)(3), murder for the purpose of escaping detection or apprehension for rape or kidnapping. Upon independent assessment, we hold that the evidence establishes beyond a reasonable doubt each of the aggravating circumstances charged against Craig.

{¶ 145} Nothing in the nature and circumstances of the offenses is mitigating. Craig abducted 12–year–old Roseanna Davenport as she was walking home. He subsequently raped and murdered her. The facts establish a horrific crime that lacks any mitigating features. Craig's character also offers no mitigation. His history and background provide little mitigation.

{¶ 146} The statutory mitigating factors are generally inapplicable. See R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal history), and (B)(6) (accomplice only). The catchall provision, R.C. 2929.04(B)(7), has some limited applicability. We give some weight to the love and support that Craig shares with his family. See *State v. Myers,* 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 178. We give considerable weight to Craig's below-average intelligence (IQ of 83). His history of substance abuse is also entitled to some weight. *State v. Landrum* (1990), 53 Ohio St.3d 107, 125, 559 N.E.2d 710. Finally, we give weight to testimony that Craig will adapt well to life in prison. *State v. Hand,* 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d

151, ¶ 281; *Madrigal*, 87 Ohio St.3d at 397, 721 N.E.2d 52. Craig's military service is entitled to no weight because he was dishonorably discharged. The evidence does not indicate that there are any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 147} After weighing each aggravating circumstance against the mitigating factors, we conclude that each aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Thus, we hold that the death penalty is appropriate.

{¶ 148} We conclude that the sentence of death is proportionate to death sentences approved in other rape-murder cases. See *Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 204; *Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196; *State v. Phillips* (1995), 74 Ohio St.3d 72, 106, 656 N.E.2d 643. The death sentence is also proportionate to death sentences approved for other kidnapping-murder cases. See *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 120. The death sentence is also proportionate to death sentences approved for other murders to avoid detection, apprehension, trial, or punishment. *Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 284; *Wilson*, 74 Ohio St.3d at 400–401, 659 N.E.2d 292.

{¶ 149} We affirm Craig's convictions. We vacate the sentences for rape and kidnapping and remand the cause to the trial court for resentencing on counts two, three, and four (rapes), and count five (kidnapping). Those sentences should be based on the law that was in effect at the time the noncapital offenses were committed. We affirm the sentence of death for the murder conviction.

> Judgment affirmed in part
> and vacated in part,
> and cause remanded.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.

Nathan A. Ray and George C. Pappas Jr., for appellant.