[Cite as *State v. Johnson*, 2024-Ohio-158.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                  :

    Plaintiff-Appellee,         :

                              No. 112172

    v.                          :

ARMOND JOHNSON,                 :

    Defendant-Appellant.        :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 18, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-641950-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Brandon A. Piteo, and Kristin M. Karkutt, Assistant Prosecuting Attorneys, *for appellee*.

Daniel J. Misiewicz, *for appellant*.

KATHLEEN ANN KEOUGH, A.J.:

{¶ 1} Defendant-appellant, Armond Johnson, appeals his convictions arising from the aggravated murders of David Cousin, Takeyra Collins, and her

children, Armond Johnson, Jr., and Aubree Stone. For the reasons that follow, this court affirms the convictions and sentence.

## I. The Indictment

{¶ 2} In July 2019, a Cuyahoga County Grand Jury issued a 26-count capital indictment against Johnson charging him with four counts of aggravated murder, an unclassified felony under R.C. 2903.01(A) (Counts 1-4); four counts of aggravated murder, an unclassified felony under R.C. 2903.01(B) (Counts 5-8); two counts of aggravated murder, an unclassified felony under R.C. 2903.01(C) (Counts 9-10); four counts of aggravated murder, an unclassified felony under R.C. 2903.01(D) (Counts 11-14); two counts of aggravated burglary, in violation of R.C. 2911.01(A)(1), felonies of the first degree (Counts 15-16); three counts of aggravated arson, in violation of R.C. 2909.02(A)(1), felonies of the first degree (Counts 17-19); one count of aggravated arson, in violation of R.C. 2909.02(A)(2), a felony of the second degree (Count 20); one count of kidnapping, in violation of R.C. 2905.01(A)(3), a felony of the first degree (Count 21); two counts of endangering children, a violation of R.C. 2919.22(A), a felony of the third degree (Counts 22-23); two counts of having weapons while under disability, in violation of R.C. 2923.13(A)(2), a felony of the third degree (Counts 24-25); and one count of tampering with evidence, in violation of R.C. 2921.12(A)(2), a felony of the third degree (Count 26).

{¶ 3} Death penalty specifications were attached to Counts 1 through 14. Specifically, Counts 1-14 each contained a course-of-conduct specification (R.C.

2929.04(A)(5)); Counts 1-7 and 9-14 each contained a specification that Johnson was under detention or an escape (R.C. 2929.04(A)(4)); Counts 1-14 each contained three felony-murder specifications (R.C. 2929.04(A)(7) — aggravated burglary, aggravated arson, and kidnapping); Counts 2, 3, 6, 7, 9, 10, 12, and 13 each contained a specification that the murder victim(s) were under the age of 13 (R.C. 2929.04(A)(9)); and Counts 4, 8, and 14 each contained a murder-to-escape detection specification (R.C. 2929.04(A)(3)).

{¶ 4} Counts 1-21, 24, and 25 each contained both one- and three-year firearm specifications. Counts 15-21 each contained a notice of prior conviction (R.C. 2929.13(F)(6)) and repeat violent offender specifications (R.C. 2941.149(A)).

{¶ 5} Johnson demanded a jury trial but waived his right to a jury trial on Counts 24 and 25, having weapons while under disability, and on all notice of prior conviction and repeat violent offender specifications as charged in Counts 15-21 — electing to have those counts tried to the bench.

## II. Jury Trial

### A. The Guilt Phase

{¶ 6} Between 10:40 p.m. and 11:30 p.m. on July 8, 2019, Anthony Geiter heard gunshots outside his residence on East 63rd Street in Cleveland, causing him to get down on the floor. He stated that while he was on the floor, he smelled something burning but that the smell eventually dissipated. Geiter said that afterward, as he headed to bed, he looked out the window and saw a white SUV drive up and park on the street. He testified that he observed a female exit the

vehicle and walk toward the back of a house located across the street. Geiter stated that the woman then walked back to her vehicle and drove off a short time later.

{¶ 7} Daniesha Mapp testified that on July 8, 2019, she planned on meeting up with David Cousin at his residence in the upstairs apartment of 3708 East 63rd Street in Cleveland. She testified that she and Cousin had been in a relationship since they were teenagers. Mapp explained that the entrance to Cousin's apartment was located in the back of the house and Cousin would either come downstairs to let her in when she called or would leave the door unlocked if it was too late. She testified that she called Cousin on her phone at around 11:30 p.m. or 11:40 p.m. that night as she drove over to his house, but he did not answer his phone. Once Mapp arrived at Cousin's apartment, she parked her car behind Cousin's vehicle, which was parked on the street across from his residence, and walked up the driveway to the back of the house. Despite the presence of Cousin's vehicle, he did not answer his phone nor unlock the door as he normally would, and no lights were on in his apartment. According to Mapp, she found this odd, but after multiple unanswered phone calls, she left and drove home. The state played home-surveillance video taken from the neighbor's house showing Mapp arriving at the residence, returning to her car, and driving away.

{¶ 8} The next morning, on July 9, 2019, Lisa Carl returned home from work. She stated that she lived in the downstairs residence of the front house located at 3708 East 63rd Street in Cleveland. Carl testified that the address also included a rear residence where Takeyra Collins, her two children, and Johnson

had just moved in a few months prior. Carl told the jury that as she walked her dog in the vacant lot next to her home, she discovered a deceased man in the field laying face-down with a gunshot wound to his neck. She called 911 and later discovered that the deceased person in the field was Cousin, her upstairs neighbor.

{¶ 9} Detective William Feian testified that on July 9, 2019, he was working basic patrol when he received a call to respond to East 63rd Street for an unresponsive male found in a vacant field. He stated that EMS was already there when he arrived. Detective Feian said that he secured the scene and started gathering information, including setting up a grid system around the field to search for possible shell casings because the victim had been shot twice. He stated that officers discovered a shell casing in the field.

{¶ 10} Detective Feian testified that he and other officers also canvassed the area for witnesses. He stated that when they approached the rear residence of 3708 East 63rd Street, he could smell smoke, but could not see inside the window. He was able to open the window from the outside and when he moved the blinds covering the window, he "saw little feet. * * * Children, little children's feet." (Tr. 2184.) The detective testified that he notified his supervisor, Lieutenant Jerry Tucker, and then gained access to the home by climbing through the window. He discovered that the children he saw from the window were deceased. Detective Feian also discovered a deceased female in the back bedroom. The deceased individuals were identified as Collins and her children, Armond and Aubree.

{¶ 11} The jury watched video from Lieutenant Tucker's body camera that showed the children laying on the bedroom floor and the condition of the home. The jury also viewed photographs depicting the same. Detective Feian described that the home "smelled like smoke, it was charred, it was dark and very hard to breathe in the home because it was very like — like I said soot, smoke damage. All the walls were blacked with smoke damage." (Tr. 2189.) When asked if he was involved further in the investigation of the matter, he responded, "I was involved with placing the defendant under arrest." (Tr. 2194.)

{¶ 12} Kevin Walsh, a detective with the Cleveland Division of Police, Crime Scene Unit, testified that he processed, documented, photographed, and collected evidence at the two crime scenes. While the jury viewed the photographs of Collins's residence, Detective Walsh testified about the fire and smoke damage to the walls, ceiling, and furniture, and he identified two McDonald's Happy Meals in the kitchen. He also photographed items discovered in the bedroom where Collins's body was found, including a gasoline can on the floor, a pile of burned clothes next to the bedroom door, blood spatter, one spent bullet casing, and one fired bullet. Detective Walsh stated that he also observed an iPhone on the arm of the couch that, according to him, appeared to have been unaffected by the fire inside the home.

{¶ 13} Cleveland police Detective Michael Shay testified that he collected DNA swabs from items inside the residence, including the gasoline can in the bedroom found next to Collins's body and the cell phone on the arm of the fire-

damaged couch. According to Detective Shay, "[n]o one stores a gas can in their bedroom, nobody. * * * We want to swab that gas can." (Tr. 2290.) Shay also testified that he believed the gas can was important because he observed pronounced fire damage to the overall house, but the gas can was not damaged by the fire.

{¶ 14} Brian Kenney, a detective with the Cleveland Fire Investigation Unit, investigated the fire at 3708 East 63rd Street. He recalled there being a strong odor of gasoline in the home. With the help of Connor, an accelerant sniffing canine, he discovered two points of incendiary fire — Collins's bedroom, where her body was discovered, and on an overstuffed chair in the living room. Detective Kenney believed that the fire was likely first set in the bedroom and then the person closed that door and then set the fire in the living room as the person left the home through the front door. He said that while the fire created a substantial amount of damage in the home, it did not destroy the entire home because the double-paned windows prevented air from coming in and, thus, the fire extinguished itself.

{¶ 15} Detective Kenney opined about the children's whereabouts during the fire. He believed that Aubree was sleeping in her bedroom with the door partially closed but awoke and walked down the hall to Armond's bedroom, leaving finger marks in the soot on the wall. Detective Kenney opined that Armond's bedroom door was fully closed at the time the fire was set, but because both children were found deceased on the floor in Armond's bedroom doorway, one of the children opened the door.

{¶ 16} Detective Kenney testified that he collected samples of the carpet, bedroom mattress, furniture, and clothing to test for ignitable liquids. He also received a reading on a photo ionizing detector that alerted to the presence of ignitable liquid on Collins's body and on the feet of both children.

{¶ 17} Dr. Dan Galita of the Cuyahoga County Medical Examiner's Office testified that he initially examined Cousin's body at the crime scene and then performed a full autopsy at the Medical Examiner's office. He said that Cousin was shot twice — once to the right chest and once to the head just behind his left ear. Dr. Galita recovered one bullet from Cousin's skull, but the other gunshot to Cousin's right chest exited his left chest so there was no bullet to recover. He opined that Cousin's cause of death was multiple gunshot wounds; the manner of death was homicide.

{¶ 18} Dr. Joseph Felo, Cuyahoga County chief deputy medical examiner for Cuyahoga County, testified that he initially examined Collins and her children inside the house, but that he supervised Collins's autopsy and performed Armond's autopsy. Regarding Armond's autopsy, he stated that six-year-old Armond died from asphyxia from carbon dioxide poisoning due to smoke inhalation from the fire at his home and opined that the manner of death was homicide.

{¶ 19} Regarding Collins's autopsy, Dr. Felo testified that Collins died from ten separate gunshot wounds — one to the back of her head, three to her torso and trunk area, three in and through her right arm, and three through her left arm. He stated that she had additional injuries such as cuts to her fingers, other lacerations,

bruises on her head and left arm, and a fractured right collarbone. Significant to Dr. Felo, Collins had no evidence of smoke in her lungs, causing him to conclude that Collins died from the gunshot wounds before the house was set on fire. Collins's manner of death was homicide.

{¶ 20} Alison Krywanczyk, a deputy medical examiner with Cuyahoga County, testified that she performed the autopsy on Aubree. She concluded that two-year-old Aubree died from asphyxia by carbon dioxide due to smoke inhalation and ruled the death a homicide.

{¶ 21} Darren Robinson, a now-retired detective of the Cleveland Police Crime Scene Unit, testified that he assisted in the investigation by processing and photographing three vehicles — Cousin's black Chevy Traverse and Collins's gold Buick Enclave and blue Ford Five Hundred. Of significance, he found two McDonald's receipts inside Collins's gold Buick Enclave. Both receipts were from the McDonald's at 6332 Broadway Avenue, dated July 8, 2019, at 8:08 p.m. and 8:19 p.m. and showed a purchase of two Happy Meals.

{¶ 22} Kristen Koeth, a firearms expert with the Cuyahoga County Regional Forensic Science Lab, performed ballistics testing on the casings recovered from the crime scenes. According to Koeth, the spent 9 mm "Blazer" brand casing found near Cousin's body and the spent 9 mm "Blazer" brand casing discovered near Collin's body were fired by the same unknown gun.

{¶ 23} Sergeant Aaron Reese with Cleveland Police Homicide Unit testified that he responded to the crime scene on July 9, 2019. He stated that after the

investigation switched from a single homicide to a quadruple homicide, his focus was to determine who was affiliated with the back residence at 3708 East 63rd Street. He stated that he retrieved pictures from a police database and showed them to a neighbor to help identify anyone of interest. One neighbor identified Johnson as the man he had previously seen with Collins and her children. Based on that identification, Sergeant Reese directed detectives to locate Johnson and he contacted Andrew Burke with the FBI to obtain Johnson's phone records.[1] Additionally, he learned that Collins had a new love interest, William Sims. Sergeant Reese said that a change in their investigation occurred after Collins's mother showed him a text message that she received from Collins's phone the night before. He testified that the message claimed that Michael Stone ("Stone"), Aubree's father, was at the house with a gun threatening to burn down the house. Accordingly, this text message shifted the focus from Johnson to Stone and detectives began investigating his whereabouts.

{¶ 24} In the meantime, Tom Ciula, a qualified forensic video and audio expert with the Cleveland Division of Police, analyzed videos collected from several sources — (1) the McDonald's located at 6332 Broadway Avenue, (2) personal home-surveillance video from 3731 East 63rd Street, (3) personal home-surveillance video from 3700 East 63rd Street, and (4) security video from Sub City

---

[1] Adult parole authority officer Robin Tilman testified that she supervised Johnson after his release from prison in March 2019 and that he gave her two phone numbers — (216) 882-8581 and (216) 507-1712.

in Maple Heights where Stone worked.  He explained to the jury that he first determined the time-of-day offsets and then he created sequence videos that showed pertinent movement of individuals in the investigation through the various videos to note the corrected time on each video.  Ciula stated that he then created frame-by-frame still images from the videos.  He stated that he then enhanced some of the videos in order to zoom in on persons or items of interest.

{¶ 25} Ciula testified that he created three videos — (1) a pre-incident video sequence, (2) a homicide-incident video sequence, and (3) a post-incident video sequence — and then he created three more videos that were zoom enhancements on certain persons or things within those video sequences.  The jury watched the videos as Ciula testified about the following relevant sequence of events captured from these videos on July 8, 2019:

> 8:07:08 p.m.  Collins drove her gold Buick Enclave to the Broadway McDonald's drive thru and ordered two Happy Meals and another item, and then left at 8:20:50 p.m.
>
> 8:22:05 p.m.  Collins drove her car into her own driveway.
>
> 8:53:56 p.m.  The Enclave leaves the driveway, but the video does not show the driver.  The vehicle heads in the direction of the McDonald's.
>
> 9:00:35 p.m.  The Enclave returns to Collins's driveway and pulls in but only slightly and remains in full view of the camera.  No one exits the vehicle.  It then leaves again, without the viewer seeing the driver.

(Tr. 2826-2835.)

{¶ 26} Ciula testified that at some time between 9:00 p.m. and 10:00 p.m., the home-surveillance camera at 3700 East 63rd Street becomes an infrared (IR) camera.  He explained that the IR function makes darker items appear lighter, but

does not include any color other than black, white, and shades of gray; reflective items will still reflect. Ciula then continued testifying about the sequence of events depicted in the videos:

10:11:22 p.m. The Enclave returns to Collins's home.

11:04:31 p.m. Cousin returns home and parks his Chevy Traverse.

11:05:24 p.m. Cousin exits his vehicle, walks across the street and up the driveway, and stops when he sees someone else on the sidewalk; a brief interaction occurs.

11:06:12 p.m. The other person chases Cousin.

11:06:55 p.m. The person who chased Cousin runs past 3700 East 63rd Street heading toward McDonald's on Broadway.

11:09:01 p.m. This same person runs back past 3700 East 63rd St., heading toward Collins's house and turning up the driveway near the field where Cousin was found the next morning.

11:17:55 p.m. A male in dark clothing walks to the Broadway McDonald's and waits there until 11:27:36 p.m. when a white sedan picks him up and he gets into the rear passenger side of the vehicle.

11:41:30 p.m. A white SUV parks behind Cousin's Chevy Traverse on East 63rd Street and over the next few minutes, a female gets out and walks up the driveway, but returns to her vehicle.

11:48:13 p.m. The female leaves East 63rd Street.

(Tr. 2839-2851.)

{¶ 27} Ciula testified about the video enhancements he created. He stated that he took the video of Cousin returning home and put it side-by-side with video of the male reacting to Cousin's presence on the street and then chasing him.

{¶ 28} Ciula also testified that he enhanced many portions of the videos, including when the person who had chased Cousin comes back toward 3708 East

63rd Street and his shoes are visible. He said that he made still frames of this person running through the IR camera both toward McDonald's and then back toward 3708 East 63rd Street. Ciula stated that because of the IR camera, the color of the shoes is unknown, but the reflective strips and the pattern on the sides of the shoes were visible and appeared in various shades of gray. He testified that the color-video surveillance camera from the McDonald's recorded this person, who wore dark-colored clothing, getting into the white sedan car.

{¶ 29} Sergeant Reese testified that after he observed the video surveillance collected by Ciula, he asked Chad Chessin with the Ohio State Highway Patrol to assist in tracking Johnson's phone and mapping its locations. Based on the information received, he, Detective Michael Legg, and his supervisor went to Johnson's home at 1019 Greyton Road in Cleveland Heights. Detective Reese testified that after speaking with Johnson's grandmother and his aunt, Kaleada Lipscomb, and seeing Kaleada's white sedan parked in the driveway, he contacted authorities to obtain a search warrant for the Greyton Road address.

{¶ 30} Detective Legg of the Cleveland Police Homicide Unit testified that in the early morning hours of July 10, 2019, he and Sergeant Reese executed a search warrant at 1019 Greyton Road in Cleveland Heights. He said that while there, they took photos and collected evidence — notably, Kaleada's cell phone, as well as a pair of shoes and jeans, both with suspected blood on them. Sergeant Reese testified that the shoes were significant because one of the surveillance videos showed an individual running to and from the scene wearing similar shoes.

According to Detective Legg, the reflective design portion of the shoes of the person running to and from East 63rd Street stood out.

{¶ 31} Mollie Jordan, a criminalist with the State Fire Marshal's Forensic Lab, testified that she performed tests on items submitted in this case. She stated that she detected gasoline on all 11 samples taken from the carpet, curtains, clothing, and bedding from 3708 East 63rd Street Jordan said that the sample submitted from the gas can found inside Collins's bedroom was also positive for gasoline. Additionally, she found gasoline on the shoes that detectives found at the Greyton Road residence.

{¶ 32} Chad Chessin, a criminal analyst for Homeland Security Investigations, testified that in 2019 he was a criminal analyst with the intelligence unit of Ohio State Highway Patrol. He stated that he was given the cell tower records for Johnson's and Kaleada's cell phones dated July 6, 2019, to July 9, 2019, and charted the relative travel of the two phones during that timeframe in a video file that was played for the jury. (Tr. 2633-2671, exhibit No. 491.)

{¶ 33} Chessin testified that on July 8, 2019, cell tower records showed the following activity regarding Johnson's cell phone:

7:23 a.m. to 9:41 p.m. Johnson's phone was in the vicinity of 3708 East 63rd Street.

9:41 p.m. Johnson's phone started to move away from the area of East 63rd Street and toward the address on Greyton Road.

10:30 p.m to 11:21 p.m.: Johnson's phone was in the area of 3708 East 63rd Street.

11:21 p.m.  Johnson's phone started to move north of 3708 East 63rd Street.

11:27 p.m.  Johnson's phone pinged off a tower close to the Broadway Avenue McDonald's.

(Tr. 2656-2662.)  Chessin said the next activity recorded from Johnson's phone occurred on July 9 at 8:27 a.m. with the phone located close to the Greyton Road address.

{¶ 34} Chessin also charted a comparison between the locations of Johnson's phone and Kaleada's phone.  He said that around 10:30 p.m. on July 8, Kaleada's phone left the area of Greyton Road and headed toward the Broadway Avenue McDonald's, arriving in the area of the McDonald's at 11:25 p.m.  Chessin testified that while Kaleada was heading toward that McDonald's, Johnson's phone was heading north away from 3708 East 63rd Street toward the McDonald's.

{¶ 35} Kaleada testified that she is Johnson's aunt.  She said that in July 2019, she lived at 1019 Greyton Road in Cleveland Heights with her mother and Johnson.  She testified that on the evening of July 8, 2019, Johnson texted her asking her to pick him up at a McDonald's on Broadway.  Kaleada identified her white Dodge Avenger in still frames taken from the McDonald's surveillance that showed her picking up Johnson around 11:20 p.m.; she took Johnson home.  She said that Johnson mows the lawns with a gas-powered mower at several family-owned properties.

{¶ 36} F.B.I. Special Agent Andrew Burke testified that he assisted the Cleveland Police Department in the investigation of the homicides on East 63rd

Street. He testified that in addition to obtaining cell tower information, he analyzed Johnson's two cell phones, Collins's cell phone discovered on the arm of the charred couch, and Kaleada's cell phone.

{¶ 37} Burke testified that his investigation of Johnson's phone revealed a photograph dated June 9, 2019, of a "semiautomatic pistol and then extended magazine which appears to be loaded on a bedspread. * * * [that] was in the bedroom of * * * Collins['s] house." (Tr. 2970-2971; exhibit No. 445-C and D.)

{¶ 38} He also stated that Collins's phone had 1,161 messages to and from Johnson. Over objection, Burke read some of the messages between Collins and Johnson into the record that indicated the two were in a relationship and engaged to be married. Burke noted, however, that from June 13, 2019, at 7:50 p.m. to June 19, at 6:20 p.m., Collins did not send any messages to Johnson, even though he messaged her. Over objection, Burke also testified about messages Collins sent to other individuals, including canceling contracts with wedding vendors and having intentions of moving to a domestic violence safe house and getting her number changed. (Tr. 2941-2944.) He stated that after June 20, the texts between Collins and Johnson were then primarily about the children and paying bills. Burke further testified about Collins's website search history conducted on her cell phone during this timeframe. He stated that she conducted a Google search for "what if your son does not want to see his father after the father has been abusive to the mother should I," (tr. 2947) and clicked on domestic violence self-help websites.

{¶ 39} Burke continued to read text messages sent between Collins and Johnson from June 20 until July 4, 2019. On June 21, Collins told Johnson that Armond did not want to see him; Johnson responded, "[I]t's crazy my kids don't even want to see what I am living for. Damn." (Tr. 2951.) On June 27, Collins texted Johnson that they "are over," to which Johnson replied that "I've been miserably without you Keyra like I know I f*** up I know I'm f*** up but I'm trying to make it but it's so crazy." (Tr. 2957.)

{¶ 40} Tameko Dillard worked with Collins as a housekeeper at the Crown Plaza. She said that they were friends and spent time at each other's houses. Dillard said that in the summer of 2019, Collins and Johnson were engaged and planned to be married on August 26th. Over objection, she said that on June 17, 2019, she noticed that Collins came to work with injuries — she had a busted lip and bruises on her body, and could barely clean any of her rooms at work. According to Dillard, it was around that time that Collins broke off the engagement and became romantically involved with Sims. According to Dillard, Collins was happy with Sims, and the two went on a trip to Chicago over the July 4, 2019 weekend — the same weekend that Johnson took the two children to his family reunion in Detroit.

{¶ 41} FBI Agent Burke testified about the text messages sent on July 7, 2019, between Johnson and Collins about returning the children back to her care. In one message, Collins tells Johnson, "it's cool you do dumb a** s*** that's why we don't want to be around you're a**, you act high couldn't take them shell house she open at 6:00 a.m. but it's cool don't worry about it we ain't got to figure out no

more arraignments [sic] * * * then they should not have went if you didn't have proper arrangements.  But you can get the f*** off my phone it's nothing else to talk about ever."  (Tr. 2960-2961.)

{¶ 42} Burke testified that on the morning of July 8, 2019, Johnson texted Collins, but she responded only inquiring about taking Armond to therapy; Johnson did not respond.  Burke said that the next message from Collins's phone to Johnson's phone was sent at 9:53 p.m. on July 8, 2019, saying, "Armond, I let Michael come see Aubree and he trying to burn my house down.  Please help me."  (Tr. 2961.)  According to Burke, this message was not read on Johnson's phone until 10:29 p.m. and Johnson never sent any response.

{¶ 43} Burke read subsequent messages sent from Collins's cell phone the night of her murder:

> 10:25:29 p.m.  Text to Sims "Yea" (sent in response to Sims's text "Baby?")
>
> 10:26:11 p.m.  Text to Sims "Yes" (sent in response to Sims's text, "I just needed to know that you were ok!")
>
> 10:43:00 p.m.  Text to "Angel" and "Mom" — "Girl aubree daddy michael is sitting outside my house"
>
> 10:44:08 p.m.  Text to Angel and Mom — "Aubree got a different daddy than armond" (sent in response to Angel's text, "Huh Michael?")
>
> 10:45:34 p.m.  Text to Angel and Mom — "Because I sent [sic] him at the store" (sent in response to Angel's text, "??? I'm lost how would he know where your new house even is")
>
> 10:45:47 p.m.  Text to Angel and Mom — "And he followed me"

10:47:24 p.m.  Text to Angel and Mom — "He just keep threatening me." (sent in response to Angel's text, "You ok?!??")

10:48:11 p.m.  Text to Angel and Mom — "Because I want let I'm see aubree" (sent in response to Angel's text, "For what")

10:49:10 p.m.  Text to Angel and Mom — "I text my other baby daddy he ain't answer I told him what's going on"

10:50:46 p.m.  Text to "Auntie Yaisha," and Mom — "Auntie" (Auntie Yaisha responded, "Yes," then called Collins at 10:52:05. When Collins did not answer, Auntie Yaisha texted again, "At work everything ok")

10:53:19 p.m.  Text to Auntie Yaisha and Mom — "Yes I seen michael"

10:54:04 p.m.  Text to Auntie and Mom — "No aubree daddy" (sent in response to Auntie's text, "He ok)

10:54:42 p.m.  Text to Auntie and Mom — "He tried to argue with me in the store" (sent in respond to Auntie's text, "Oh")

10:55:29 p.m.  Text to Angel and Mom — "No" (sent in response to Angel's text, "Girl is this another prank")

11:03:38 p.m.  Text to Mom and "Mommy" — "Mom I let Michael come see aubree and he got a gun and trying to burn my house down he keep talking about i keep his daughter away from him he been following me all day I sent [sic] in the store and he followed me home"

(Tr. 2910-2912; exhibit No. 444-B.)  Burke testified that Collins's phone did not have Stone's phone number, address, or any information about him and there was no evidence that the two had ever communicated with each other using that phone.

{¶ 44} Sergeant Reese testified that he analyzed Agent Burke's extraction from Kaleada's phone and found that her phone had the following messages from Johnson on July 8, 2019, that did not appear on Johnson's phone:

10:29:50 p.m.  "Come get me."

10:30:09 p.m.  "Same spot last time."

11:01:18 p.m. "Where you at?"

11:20:02 p.m. "I'm sorry I just want to know where you are."

(Tr. 3014-3015; exhibit No. 462-A.) He also stated that between 9:02 p.m. and 11:27 p.m. on July 8, 2019, Kaleada's phone showed 16 calls from Johnson's phone number, including FaceTime calls.

{¶ 45} Jeffrey Oblock, a DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory, performed the DNA testing in the case. He stated that the swabs taken from the handle of the gas can recovered next to Collins's body in her bedroom contained Johnson's DNA — up to 93 percent of the DNA mixture. Oblock testified that Collins's DNA matched the blood spot found on the jeans and on the left shoe taken from the Greyton Road residence. He further testified that based on his testing, Johnson was the "wearer" of those jeans and shoes. Finally, with respect to swabs taken from Collins's iPhone found on the couch inside the home, Oblock found a mixture of Johnson's and Collins's DNA.

{¶ 46} Sergeant Reese testified that he investigated other potential suspects in the case —Stone, Junius Thompson (an ex-boyfriend of Collins),[2] and Sims — and excluded each one as a possible suspect.

{¶ 47} Stone testified that he was Aubree's natural father. He stated that although he paid child support for Aubree, he did not have much of a relationship with her or Collins. In fact, he said that in 2019, he did not know where they were

_____

[2] Thompson's DNA was not discovered on any tested items recovered from Collins's home.

living, nor did he have Collins's phone number. He stated that on July 8, 2019, he was working at Sub City in Maple Heights. He identified his work timecard showing that on July 8, 2019, he clocked in at 5:28 p.m. and clocked out at 11:23 p.m. Additionally, he identified himself in a still frame from a Sub City security video showing him working throughout the relevant timeframe on July 8, 2019. The videos collected by Ciula corroborated Stone's alibi and testimony that he was at Sub City in Maple Heights the night Cousin, Collins, and her children were murdered. Stone denied killing Collins and his daughter.

{¶ 48} Sims testified that he met Collins at their place of employment, the Crown Plaza Hotel in Middleburg Heights. He said that he had previously met Johnson, who worked at the Crown Plaza for a week in June 2019. Sims testified that he loved Collins, and the two were happily in a relationship. He said they vacationed in Chicago until July 8, 2019. Sims testified that after returning home, he became concerned when some of her text messages began to "sound different." (Tr. 2414.) He stated that her text messages were short one-word answers, which was unlike her. Sims said that Collins did not show up to work on July 9, and did not call, which was also unlike her; he later found out about her death. He stated that he was at home during the evening of July 8, 2019, and did not kill Collins. Sims's DNA was not discovered on any tested items recovered from Collins's home.

## B. The Guilt Phase Verdict

{¶ 49} Following the close of the state's case-in-chief, Johnson moved for a Crim.R. 29 judgment of acquittal. The state conceded that the evidence did not

support Count 17 charging aggravated arson and naming Collins as the victim because the evidence demonstrated that her cause of death was not from arson, but from gunshot wounds. As such, the state also conceded that the felony-murder specifications identifying aggravated arson as the underlying felony in Counts 1, 5, and 11 should be dismissed. Accordingly, the trial court granted, in part, Johnson's Crim.R. 29 motion based on the state's concessions. All other relevant charges and specifications were submitted to the jury.

{¶ 50} The jury found Johnson not guilty of Counts 15 and 16, aggravated burglary. It found Johnson guilty of Count 1, including all remaining specifications except the felony murder specification (aggravated burglary); Count 2, including all specifications except the three-year firearm and felony murder specification (aggravated burglary); Count 3, including all specifications except the three-year firearm and felony murder specifications (aggravated burglary); Count 4, including all specifications except the felony murder specification (aggravated burglary); Count 5, including all specifications except the felony murder specification (aggravated burglary); Count 6, including all specifications except the three-year firearm and felony murder specifications (aggravated burglary); Count 7, including all specifications except the three-year firearm and felony-murder specifications (aggravated burglary); Count 8, including all specifications except the felony murder specification (aggravated burglary); Count 9, including all specifications except the three-year firearm and felony murder specifications (aggravated burglary); Count 10, including all specifications except the three-year

firearm and felony murder specifications (aggravated burglary); Count 11, including all specifications except the felony murder specification (aggravated burglary); Count 12, including all specifications except the three-year firearm and felony murder specifications (aggravated burglary); Count 13, including all specifications except the three-year firearm and felony murder specifications (aggravated burglary); Count 14, including all specifications except the felony murder specification (aggravated burglary); renumbered Count 17, including the one-year firearm specification, but not the three-year firearm specification; renumbered Count 18, including the one-year firearm specification, but not the three-year firearm specification; renumbered Count 19, including both the one- and three-year firearm specifications; renumbered Count 20, including both the one- and three-year firearm specifications; renumbered Counts 21 and 22, child endangering and a further finding that the state proved that the violation caused serious physical harm to the children; and renumbered Count 23.

{¶ 51} The court found Johnson guilty of Counts 24 and 25, including the one-year firearm specification, but not the three-year firearm specification attendant to each count. Regarding the notice of prior conviction and repeat violent offender specifications attendant to renumbered Counts 17-20, the court took notice of the stipulated prior convictions and found Johnson to be a repeat violent offender as charged under those counts.

## C. The Sentencing Phase

{¶ 52} The matter proceeded to the sentencing phase of trial, with the state electing to proceed on the death-penalty specifications in Counts 1, 2, 3, and 4 — aggravated murder under R.C. 2903.01(A). Following the presentation of aggravating evidence by the state and mitigating evidence by Johnson, the jury found that the aggravating circumstances did not outweigh beyond a reasonable doubt the statutory factors found in R.C. 2929.04 and thus, that the appropriate sentence would be life without the possibility of parole on each of Counts 1-4.

{¶ 53} Following merger, the application of the Reagan Tokes Law, the imposition of consecutive sentences, and in accordance with the jury's sentencing verdict on Counts 1-4, the trial court ordered that Johnson serve an aggregate prison sentence of life without parole.

## III. The Appeal

{¶ 54} Johnson now appeals, raising six assignments of error.

### A. Evid.R. 404(B) Other Acts Evidence

{¶ 55} On July 15, 2022, the state filed a notice of intent to present Evid.R. 404(B) evidence during trial. Specifically, the state wished to present text messages between Johnson and Collins that purportedly implied that Johnson was previously physically abusive toward Collins. According to the state, the evidence was admissible pursuant Evid.R. 404(B) because it would show Johnson's motive, intent, opportunity, and the absence of mistake or accident. Additionally, the state

contended that this evidence would support the issue of identity — that Johnson committed these murders.

{¶ 56} On August 23, 2022, the trial court conducted a hearing on the state's motion. Following the hearing, the court concluded that several text messages were inadmissible, but others were admissible. The messages that the court admitted implied that Johnson was physically abusive toward Collins, that he previously pulled a gun on her, and that he was upset with Collins for ending their relationship. The court reasoned that it allowed these messages because "[u]nder 404[B], obviously the issue in this case is the identity and these statements are corroborative of prior acts that would bolster the issue on identity and motive." (Tr. 2454.)

{¶ 57} In his first assignment of error, Johnson contends that the trial court abused its discretion by admitting other acts evidence because other less prejudicial evidence existed to prove that Collins and Johnson had a strained relationship (motive and intent) and that Johnson was the person who murdered Collins (identity). Johnson contends that the messages were therefore only offered to show that he was an abusive man in the past and that, on July 8, 2019, he acted in conformity with that bad character. We find no abuse of discretion.

{¶ 58} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. The court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence

that is admissible for a permissible purpose." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 72.

{¶ 59} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, 165 N.E.3d 1123, ¶ 36. Nevertheless, evidence of a defendant's other crimes, wrongs, or acts may be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2); *see also* R.C. 2945.59. "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 60} The Supreme Court of Ohio has put forth a three-step analysis for a trial court to use in determining the admissibility of other acts evidence. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. "The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.*, citing Evid.R. 401. Next, the trial court must determine "whether the evidence is presented to prove a person's character to show conduct in conformity therewith or whether it is presented for a legitimate

other purpose." *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 139. "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Hartman* at ¶ 27, citing *Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Finally, the last step is "to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice." *Williams* at ¶ 20.

{¶ 61} Evidence of a defendant's threats, violence, or other behavior in the months preceding a murder is probative of the defendant's motive or intent. *State v. Nields*, 93 Ohio St.3d 6, 22, 752 N.E.2d 859 (2001). However, "an act too distant in time has no probative value to the charged crime." *Id*. The defendant's other act "must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question." *State v. Snowden*, 49 Ohio App.2d 7, 10, 359 N.E.2d 87 (1st Dist.1976), citing *State v. Burson*, 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974).

{¶ 62} In domestic homicide cases, evidence of domestic violence proving a "strained relationship" between the defendant and victim may be admissible to show motive, intent, and absence of mistake. *Nields* at 22. Moreover, when the prior act of domestic violence is temporally connected to the crime, courts have allowed the admission of the domestic violence evidence to prove identity when the defendant makes identity a material issue by denying to being the perpetrator

of the current crime. *State v. Thompson*, 8th Dist. Cuyahoga No. 81322, 2003-Ohio-3939, ¶ 24.

{¶ 63} In *Thompson,* this court upheld a trial court's decision to allow testimony from an officer who arrested the defendant on a charge of domestic violence three months prior to the murder, and testimony from the deceased-victim's sister that the defendant was in jail for domestic violence. This court reasoned that the testimonies were probative to show the defendant's intent and motivation, but also his identity, because the defendant blamed the murder of the victim on someone in his apartment building. *Id*. at ¶ 27.

{¶ 64} In this case, the court permitted text messages sent between Collins and Johnson in May 2019, in which she accused Johnson of pulling her hair, calling her names, and pulling a gun on her. In the messages, Johnson did not deny her statements, including that he pulled a gun on Collins, but stated that he did not mean what he said and was angry, and then begged for another chance. Additionally, the fact that Johnson pulled a gun on Collins in May was probative of his motivation and intent of using a gun to kill her in July. Collins's coworker testified that on June 17, 2019, she observed injuries to Collins, including a busted lip and bruising. She stated that on this date, Collins was no longer engaged to Johnson. This timing coincided with the lack of text messages from Collins to Johnson during a time when she was seeking a domestic violence safe house and canceling the wedding plans. This timeline of May, to June, to July showed an escalation of violence and proved a strained relationship, and when combined with

Collins's decision to end the relationship, the messages were also probative of whether Johnson committed the homicide with prior calculation and design. *See State v. Hundley*, 162 Ohio St.3d 509, 519-522, 2020-Ohio-3775, 166 N.E.3d 1066.

{¶ 65} Additionally, identity was central to the state's case. Johnson's theory of his defense was that he was not the person who committed these murders; thus he placed his identity as the killer at issue in a way that implicated Evid.R. 404(B). The state demonstrated that Johnson used Collins's phone to send messages to himself and to Collins's contacts, including her mother, that accused Stone of threatening Collins with a gun and threatening to set the house on fire. The evidence showed that Johnson, whose DNA was discovered on Collins's phone, sent these messages after Collins was murdered, but before setting the fire. This attempt to frame Stone supports the trial court's decision to admit this evidence to prove that Johnson used prior calculation and design, planning out his strategy of covering-up his actions before he left Collins's house. This evidence proved that Johnson was the person who killed Collins and her children, but it also proved that Stone did not.

{¶ 66} Additionally, the trial court provided the jury with a limiting instruction both when the state introduced the text messages during trial and again when the court gave the jury their final charge prior to deliberation. In each instruction, the trial court explained to the jury the purposes, and for which charges, the text-message evidence could be considered — Counts 1, 5, and 11, the aggravated murder charges with Collins as the named victim. A jury is presumed

to follow the instructions, including curative instructions, given by a trial judge. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). Johnson has not demonstrated that the jury failed to follow the instructions given by the trial court.

{¶ 67} Accordingly, the admission of evidence of prior acts of domestic violence that occurred just two months prior to the murder and evidence of a strained relationship was permissible to show intent, motive, and identity. Accordingly, the trial court did not abuse its discretion in admitting certain text messages between Collins and Johnson. The first assignment of error is overruled.

## B. Autopsy Photographs

{¶ 68} Johnson contends in his second assignment of error that the trial court abused its discretion in admitting certain autopsy photographs of each victim into evidence. Specifically, he contends that the autopsy photos, especially those of the children, provided no probative value to the matter because he did not dispute the cause of death, and their admission served only to inflame the jury and caused unfair prejudice. We disagree.

{¶ 69} Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle*, 65 Ohio St.3d 597, 601, 605 N.E.2d 916 (1992). Generally, autopsy photos are admissible where they are probative of the defendant's intent and the manner and circumstances of the victim's death. *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 92.

{¶ 70} Although autopsy photos may not have been necessary to prove cause of death, the admission of the photos does not automatically make them

overly prejudicial because they are "probative evidence of a purpose to cause death." *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 102. The Supreme Court reiterated that the prejudicial impact of autopsy photos does not outweigh their probative value. *Id.* at ¶ 103; *see also State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303 (holding that gruesome autopsy photos are probative of intent and are not overly prejudicial); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242 (holding that autopsy photos are admissible to show intent to kill). "[T]he state bears the burden of proof and it has no obligation to meet that burden in the least gruesome way." *Mammone* at ¶ 103.

{¶ 71} Our review of the record reveals that the state introduced a limited number of autopsy photographs, all of which depict only the exterior of the victims' bodies. Regarding the four victims whom Johnson murdered, the state only introduced five photographs of Cousin, 11 photographs of Collins, and 2 photographs each of Armond and Aubree — only showing their faces and feet. The autopsy photos were admissible to show the location and number of gunshot wounds to Collins and Cousin, demonstrating Johnson's intent of causing the death of these two victims.

{¶ 72} Moreover, the manner in which each death was caused permitted the jury to understand the state's theory of the case. Regarding the death of Collins, the evidence showed that she suffered from ten separate gunshot wounds but had no signs of smoke in her lungs. This evidence proved that Collins died before her

house was set on fire. This information provided a timeframe for comparison to the murders of her children and Cousin.

{¶ 73} Regarding the two photographs of each child, the state maintained that the children walked on the floor after the fire started and the soot had settled, but were unable to leave the home, which supported the state's theory that the smoke from the fire caused their death and was the means to endanger them. The timeline created by Collins's death established that the children were still alive when Johnson murdered their mother because they had an excessive amount of carbon dioxide in their bloodstreams. Based on the foregoing, we find no abuse of discretion in admitting the limited number of autopsy photographs of each of the four victims.

{¶ 74} Moreover, even if this court were to find that the autopsy photographs were improperly admitted, any error would be harmless because the jury observed other photographs and body-camera video of the victims. Specific to the children, these other uncontested images were arguably more impactful because they showed two young, deceased children with soot-covered feet laying within inches of each other on the floor of the charred bedroom. Accordingly, any error in admitting the autopsy photographs of the children showing their faces and feet was harmless error at best.

{¶ 75} Johnson's second assignment of error is overruled.

## C. DNA Opinion Testimony

{¶ 76} The trial court recognized, without objection, forensic scientist Jeffrey Oblock as an expert in the area of DNA analysis. Oblock testified about his findings relative to DNA evidence collected in the quadruple homicide investigation. Specific to this assignment of error, the state questioned Oblock about a pair of jeans, purportedly belonging to Johnson, that detectives collected during a search of the Greyton Road residence. Oblock testified that the jeans contained trace amounts of Collins's blood. (Tr. 2770-2775.) He testified, without objection, that a swab of the waistband yielded a mixture of DNA from three contributors including both Johnson and Collins. Without objection, he stated that the purpose of swabbing and then testing the waistband of the jeans would be to "determine the ID of the wearer of those pants. The waistband is a good source of DNA. That is where it's in contact with your body the most." (Tr. 2776.) Oblock then testified about the strength of the ratios present in the DNA mixture — "generally the higher the likelihood ratio, the more that individual is contributing their DNA." (Tr. 2777.) Regarding the waistband mixture, Oblock said that the "weight for [Johnson] is around 78 percent contribution. For [Collins], 11 percent." (Tr. 2778.) He opined that based on the percentages, he "would attribute [Johnson] as the wearer of those pants." (Tr. at *id*.)

{¶ 77} In his third assignment of error, Johnson contends that the trial court abused its discretion in allowing Oblock to opine that Johnson was the "wearer" of the pants because he did not provide any statistical analysis or

threshold determination relative to how much DNA should or may be on an item of clothing to determine who wore the clothing or the source of the DNA. We disagree.

{¶ 78} Evid.R. 703 provides that the "facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." "It is important to note that Evid. R. 703 is written in the disjunctive. Opinions may be based on perceptions or facts or data admitted in evidence." *State v. Solomon*, 59 Ohio St.3d 124, 126, 570 N.E.2d 1118 (1991). Evid.R. 705 provides, "The expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." Therefore, "'the facts underlying an expert's opinion must be either part of the expert's personal knowledge or admitted into evidence at the hearing or trial.'" *State v. Norman*, 8th Dist. Cuyahoga No. 104244, 2017-Ohio-92, ¶ 78, quoting *Jarvis v. Hasan*, 10th Dist. Franklin No. 14AP-578, 2015-Ohio-1779, ¶ 30.

{¶ 79} We find no error, plain or otherwise, in the trial court's decision allowing Oblock to provide his opinion testimony that Johnson was the wearer of the recovered jeans. Oblock testified that Johnson's DNA comprised 78 percent of the DNA mixture found on the waistband of the jeans. This information, coupled with the fact that the jeans were recovered from the Greyton Road residence where Johnson was living, demonstrates that Oblock's opinion was based on facts and data admitted into evidence. Moreover, because Johnson was the majority

contributor of DNA, expert testimony was not necessary for the jury to conclude or infer that Johnson wore these jeans.

{¶ 80} Accordingly, the third assignment of error is overruled.

**D. Shoe Testimony**

{¶ 81} Prior to Sergeant Reese testifying, Detective Legg testified that on July 10, 2019, he and Sergeant Reese executed a search warrant at the Greyton Road residence. Detective Legg testified about photographs taken during the execution of the search warrant, including those taken of a bedroom where a pair of shoes were on the floor. He said, without objection, that the "multi-colored yellow, pink" shoes seen in exhibit Nos. 311 and 312 were collected as evidence because

> during the course of the investigation we were able to obtain some surveillance video from a residence located on East 63rd, I believe a couple of doors north of where the incident occurred. We were able to view surveillance video depicting an individual running from and then back to that scene.
>
> In that surveillance video it would appear that the individual was wearing some kind of running shoes, sneakers of some sort, but it also appeared that there were some kind of, almost like a reflective design on the shoes that stood out when you paused the video.

(Tr. 2402-2404.)

{¶ 82} Sergeant Reese subsequently testified that prior to executing the search warrant with Detective Legg, he had also viewed the surveillance video showing a person of interest running to and from the home on East 63rd Street. He stated that in the event that they would conduct a search of the Greyton Road residence, he brought printed-out still frames or photographs of that person to

refer to the images, particularly the clothing and shoes that the person of interest was wearing, to compare it to any clothing or shoes present inside the home. Sergeant Reese testified regarding exhibit Nos. 311 and 312 — photographs of tennis shoes found inside the residence. He testified, over objection, "[t]he tennis shoes that I just was discussing that a person of interest was wearing. We believed these to be those tennis shoes." (Tr. 3009-3010.)

{¶ 83} Johnson contends in his fourth assignment of error that the trial court abused its discretion in allowing improper testimony from Sergeant Reese connecting the shoes recovered during the search of the Greyton Road home to the person of interest in the video footage. He contends that Sergeant Reese's testimony was improper, misled the jury, and was more prejudicial than probative. We disagree.

{¶ 84} This court has consistently recognized that the testimony of a state's witness, who is not presented as an expert is properly admitted under Evid.R. 701 when (1) the testimony is based on the witness's training or experience, (2) the testimony relates to the witness's personal observations with the investigation, and (3) the testimony is helpful to determine a fact at issue. *See, e.g., State v. Wilkinson*, 8th Dist. Cuyahoga No. 100859, 2014-Ohio-5791, ¶ 52-53; *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 74, ¶ 75; *State v. Cooper*, 8th Dist. Cuyahoga No. 86437, 2006-Ohio-817, ¶ 18.

{¶ 85} Courts have applied these criteria in finding a police officer's testimony regarding footprint comparisons and a person's tread pattern taken

from the bottom of a shoe or boot as admissible lay opinion testimony. *See, e.g.,*

*State v. Jells*, 53 Ohio St.3d 22, 559 N.E.2d 464 (1990). In *Jells*, the Ohio Supreme

Court stated:

> [A] lay witness may be permitted to express his or her opinion as to the similarity of footprints if it can be shown that his or her conclusions are based on measurements or peculiarities in the prints that are readily recognizable and within the capabilities of a lay witness to observe. This means that the print pattern is sufficiently large and distinct so that no detailed measurements, subtle analysis or scientific determination is needed. In such a situation, the pattern is simply identified as being similar to that customarily made by shoes. In essence, the testimony is "more in the nature of description by example than the expression of a conclusion." *See* [*State v. Hairston*, 60 Ohio App.2d 220, 223, 396 N.E.2d 773 (3d Dist.1977)].

*Id.* at 29.

{¶ 86} This court has also applied the *Jells* rationale in upholding officer

opinion testimony regarding boot prints in the snow and shoe marks on doors. *See*

*State v. McGowan*, 8th Dist. Cuyahoga No. 96608, 2011-Ohio-6166 (trial court

properly admitted officer testimony regarding boot prints discovered at the crime

scene that matched the defendant's boot-tread pattern); *State v. Grice*, 8th Dist.

Cuyahoga No. 97046, 2021-Ohio-1938, ¶ 28 (officer's testimony comparing a shoe

mark on a door with defendant's shoes was properly admitted under Evid.R. 701).

{¶ 87} Although the comparison in this case involves the pattern on the

upper part of the shoe, we find the *Jells* analysis in comparing tread patterns

analogous. Applying the *Jells* rationale, Sergeant Reese was properly permitted to

give his opinion about the shoes because it was rationally based on his perceptions

and was helpful to a determination of a fact in issue — that the shoes discovered

were the shoes worn by the person of interest in the surveillance videos. Detective Legg had already provided testimony, without objection, that he too believed that the shoes discovered in the search were significant based on the surveillance video still images showing the similar upper shoe pattern. Accordingly, we find no error in the trial court's admission of Sergeant Reese's testimony.

{¶ 88} Even if the testimony was improper, the error would be harmless. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." The jury viewed the person of interest in the home-surveillance videos several times, often frame-by-frame. Additionally, the jury heard and saw evidence that the shoes that the police recovered from the Greyton Road residence were found near Johnson's other belongings, including a pair of jeans containing traces of Collins's blood. Accordingly, the jury was able to make their own determinations about whether the shoes worn by the person of interest in the video were the shoes discovered by police.

{¶ 89} Moreover, the forensic analysis conducted on the shoes revealed the presence of (1) Johnson's DNA; (2) gasoline, which was the same accelerant used to set the house on fire; and (3) Collins's blood. As the state correctly points out, the presence of gasoline and Collins's blood are two pieces of evidence that the perpetrator would likely have on his shoes. Accordingly, the jury could reasonably conclude that Johnson was both the person of interest in the videos and the person

who committed the murders based on the forensic evidence discovered on the shoes. As such, the testimony regarding the reflective pattern was harmless.

{¶ 90} Johnson's fourth assignment of error is overruled.

### E. Sufficiency and Manifest Weight of the Evidence

{¶ 91} In his fifth and sixth assignments of error, Johnson challenges the evidence presented at trial, contending that the state presented insufficient evidence to support his convictions and that his convictions are against the manifest weight of the evidence. Although he lists these assignments of error separately, Johnson relies on the arguments of one assignment of error to support the arguments of the other. Accordingly, this court will also address them together.

{¶ 92} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Cottingham*, 8th Dist. Cuyahoga No. 109100, 2020-Ohio-4220, ¶ 32. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

{¶ 93} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue

rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *Thompkins*, at 387. In a manifest-weight analysis, the reviewing court sits as a "thirteenth juror" and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins* at 386.

{¶ 94} Although sufficiency and manifest weight are different legal concepts, manifest weight subsumes sufficiency in conducting the legal analysis; that is, a finding that a conviction was supported by the manifest weight necessarily includes a finding of sufficiency. Thus, a determination that a conviction is supported by the weight of the evidence will also dispose of the issue of sufficiency. *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2015-Ohio-1946, ¶ 11, citing *Thompkins*; *see also State v. Nunez*, 8th Dist. Cuyahoga No. 104623, 2018-Ohio-83, ¶ 6.

{¶ 95} Johnson does not separately identify each charge that he was convicted of and argues that the state failed to prove one or more of the elements of each offense. Instead, he contends that his convictions overall are against the

manifest weight of the evidence because (1) inconsistences existed in the cell phone evidence regarding the timing of events; (2) the DNA evidence was inconclusive; (3) no firearm was recovered nor was a firearm connected to him; and (4) evidence was improperly admitted that unfairly prejudiced him, i.e., text messages, impermissible opinions on DNA, and inferences regarding the recovered shoes.

{¶ 96} Johnson contends that inconsistencies exist in the timing between text messages sent from him to Kaleada and the witness testimony about hearing gunshots on East 63rd Street. According to Johnson, it is inconsistent that Geiter heard gunshots between 10:40 p.m. and 11:30 p.m. and smelled something burning over an hour after Johnson texted his aunt for a ride at 10:29 p.m. We find no inconsistency.

{¶ 97} The jury could reasonably conclude that Johnson was still at Collins's home when he texted his aunt for a ride after setting Collins's house on fire. What Johnson did not expect was Cousin, who knew Johnson, arriving home after he sent this text message and finding him walking away from the crime scene. Home-surveillance video showed Cousin exiting his vehicle at 11:06 p.m. and encountering Johnson on the sidewalk as he walked toward the back of his residence. After what appears to be a brief exchange between the two, Johnson chased after Cousin. Less than one minute later, Johnson runs down the sidewalk, toward the McDonald's, only to run back to the scene three minutes later at 11:09 p.m. The state presented video evidence showing Johnson near Mound Elementary School at 11:15 p.m., and at 11:17 p.m., Johnson is observed from

surveillance at the McDonald's on Broadway waiting for his aunt, who admitted that she picked him up at 11:27 p.m. and took him back to the Greyton Road residence. The state's direct evidence provides an uncontroverted timeline supporting Geiter's testimony that he heard gunshots and smelled something burning between 10:40 and 11:30 p.m.

{¶ 98} Johnson's next challenge to the evidence pertains to his belief that the DNA evidence discovered inside Collins's home is inconclusive to prove that he murdered Collins and her children. He maintains that the presence of his DNA was expected because he had recently taken a trip with the children, regularly visited with the children, and previously lived at the home. Johnson's argument is unavailing because DNA was not merely discovered on general areas inside the home; his DNA was present on key pieces of evidence — Collins's cell phone that was inexplicably unscathed by the smoldering fire surrounding it and the handle of a gas can found in the middle of Collins's bedroom. The jury could reasonably conclude that Johnson used Collins's cell phone to send fake texts to himself and others in an attempt to frame Stone and started the fire using gasoline from the gas can.

{¶ 99} Johnson next challenges his convictions by contending that police did not recover a firearm or link him to one in any way. Recovery or discovery of the murder weapon was not necessary to convict Johnson of the murders of Cousin, Collins, and her children. The video surveillance evidence and DNA evidence placed Johnson at East 63rd Street and inside Collins's home the night of

the murders. Additionally, ballistics evidence and testimony revealed that the same brand of 9 mm casing was found near Cousin's and Collins's bodies and fired by the same unknown gun. A reasonable jury could conclude that Johnson used the same firearm to kill both Collins and Cousin.

{¶ 100} Johnson's final challenge to the weight of the evidence reasserts his previously raised arguments that the trial court erroneously admitted unfairly prejudicial evidence — text messages regarding past allegations of domestic abuse, Oblock's testimony about DNA evidence, and the inferences that the shoes recovered from the Greyton Road residence were the shoes that Johnson was wearing when he committed the murders. Because this court previously addressed these challenges and found no error in the trial court's decision permitting this evidence, the admission of such evidence does not go against the weight of the evidence supporting his convictions.

{¶ 101} Based on the foregoing, the jury heard the witnesses, evaluated the evidence, and was convinced of Johnson's guilt beyond a reasonable doubt that he murdered Collins, Cousin, Armond, and Aubree. The evidence proved that (1) Johnson was the only person who had a strained relationship with Collins, (2) Collins's blood was found on Johnson's pants, (3) Johnson's DNA was on the gasoline can next to Collins's dead body, (4) gasoline and Collins's blood was detected on Johnson's shoes, and (5) Johnson's DNA was found on Collins's phone, which was used after her death to try to frame an innocent man for killing Collins and her children. Accordingly, this is not the exceptional case where the evidence

weighs heavily against Johnson's convictions. Accordingly, his convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The fifth and sixth assignments of error are overruled.

### F. Reagan Tokes Law

{¶ 102} Johnson contends in his final assignment of error that the trial court erred when it sentenced him to an indefinite sentence under S.B. 201, commonly referred to as the Reagan Tokes Law, because the law is unconstitutional under the United States and Ohio constitutions because it violates due process, the separation-of-powers doctrine, and the right to trial by jury.

{¶ 103} Recently, the Ohio Supreme Court rejected the arguments Johnson raises challenging the constitutionality of the Reagan Tokes Law. *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535. The court held that the Reagan Tokes Law is not facially vague or unconstitutional because (1) it provides that offenders receive a hearing before the Department of Rehabilitation and Correction ("DRC") may extend their prison sentence beyond the minimum but within the maximum term imposed by the trial court, (2) the right to a jury trial is not implicated since no determination by the DRC at the hearing changes the sentence range prescribed by the legislature and imposed by the trial court, and (3) the authority it gives the DRC to extend an offender's prison sentence beyond the minimum but within the maximum range imposed by the trial court does not exceed the power given to the executive branch of the government and does not interfere with the trial court's discretion when sentencing the offender. *Id.* at ¶ 25, 28, 40. Accordingly, based

on the authority of *Hacker*, this court summarily overrules Johnson's challenges to the Reagan Tokes Law and his assignment of error.

{¶ 104} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
MICHELLE J. SHEEHAN, J., CONCUR